658 So.2d 331 (1995)
In re James Ronald HAMPTON and Jan Harris Milz Hampton, Applying for Adoption, Plaintiff-Appellee,
v.
J.A.L. (Natural Parent of the Child), Defendant-Appellant.
No. 27869-JA.
Court of Appeal of Louisiana, Second Circuit.
July 6, 1995.
Rehearing Denied August 17, 1995.
*332 Northwest Louisiana, Legal Services, Inc. by E. Paul Young, Steven A. Campbell, Mary Ellen Halterman, Shreveport, for appellant.
Love, Rigby, Dehan & McDaniel by Kenneth Rigby, Shreveport, for appellee.
Before SEXTON, NORRIS, LINDSAY, WILLIAMS and STEWART, JJ.
NORRIS, Judge.
J.L., the Indian mother of A.S.L., appeals a trial court judgment allowing her to withdraw her consent to adoption under the provisions of the Indian Child Welfare Act (ICWA), but denying her writ of habeas corpus and awarding sole care, custody and control of the child to the Hamptons, a non-Indian couple, subject to reasonable visitation. J.L. has assigned three errors under the ICWA. The Hamptons have answered the appeal, urging the inapplicability of the ICWA. For the following reasons, we reverse in part, affirm in part and remand.

Procedural history
On July 26, 1994, J.L., then 17 years of age, gave birth to a baby girl, A.S.L., in Shreveport. In August 1994, just after her eighteenth birthday, J.L. executed a Voluntary Act of Surrender For Adoption under state law (Title XI of the Louisiana Children's Code) irrevocably terminating her parental rights to A.S.L. Also in August, J.L. sent a letter, prepared by Mr. Hampton and signed by her, to Janet Collins, the coordinator of the Indian Child Welfare Program of the Cheyenne River Sioux Tribe, advising them she did not want the tribe involved in the matter. Consequently, the tribe explicitly declined jurisdiction over the matter.[1] In December, the Hamptons filed a motion for a rule to terminate the alleged natural father's parental rights. Because his whereabouts were unknown, a curator ad hoc was appointed, and his parental rights to A.S.L. were subsequently terminated. In January 1995, J.L. filed a pro se affidavit demanding the return of her daughter. On January 25, 1995, Mary Halterman of Northwest Louisiana Legal Services, Inc. enrolled as counsel for J.L. On January 30, J.L. filed a notarized "Revocation of Voluntary Consent," revoking her consent to the adoption and requesting that her child be returned to her under the ICWA. In March, she filed a Motion to Dismiss Adoption Proceedings and Writ of Habeas Corpus. The Hamptons answered, maintaining that the ICWA does not apply in the instant case and that J.L. is not entitled to the return of her child under state law.

Factual evidence adduced at the hearing
J.L. is 11/16 Indian blood and is a member of her father's tribe, the Cheyenne River Sioux. She was born on the Standing Rock Sioux Reservation in South Dakota (her mother's tribe), and lived there for nine years. After her father died, she moved with her mother and siblings off the reservation. Except for a short two-week stay with her aunt at Standing Rock in November 1994, she has not lived on a reservation since.
J.L. had a tumultuous childhood marked by alcoholism and violence. When J.L. was not in juvenile detention centers or rehabilitation centers for drug and alcohol abuse, she lived with her mother and stepfather. Her mother, also an alcoholic, was often verbally abusive; she has been in jail in the past. Her stepfather has a record of criminal convictions and has been in and out of jail periodically. Her maternal grandfather is also an alcoholic, has lived with them in the past, and was convicted as recently as May of 1994 for drunk and disorderly conduct. The majority of J.L.'s brothers and half brothers, some of whom lived with her and her mom and stepfather, have engaged in criminal activity; most have been convicted and either have served or are presently serving time in jail or state detention centers. J.L.'s criminal history began at age 15 when she stabbed her stepbrother with a knife. She admits to *333 using crack cocaine in November 1993 and abusing alcohol and drugs (marijuana) as late as December 1994. She is currently on welfare and living with her mother in Minneapolis; she has never been able to maintain employment. Recently, she was also diagnosed with Myasthenia Gravis, which causes severe respiratory difficulty and occasionally unconsciousness necessitating hospitalization, and renders work difficult if not impossible.
After learning she was pregnant, J.L. decided to put the baby up for adoption. Her friend and sponsor in Alcoholics Anonymous, Susan Schloss, found a family, the Hamptons, to adopt the baby. The Hamptons live in Bossier City, Louisiana. J.L. met with the Hamptons and agreed to the adoption. The day after A.S.L. was born, she allowed the Hamptons to take custody; the child has remained with the Hamptons ever since. A.S.L.'s paternity has never been conclusively established. J.L. testified at the hearing that the father is Indian, despite her sworn affidavit that the father was "unknown," and statements to her legal counsel and the Schlosses in the past that she believed a non-Indian man was the father. J.L. admitted that either man could be the father. The alleged father has had no contact with the child; neither his Indian descent nor any tribal membership has ever been established. However, A.S.L. is eligible to enroll in the tribe based on her mother's membership.

Reasons for judgment
After a two-day hearing in late March, the trial court rendered its decision and explained its reasons in open court. A formal written judgment was subsequently filed. The court determined that the ICWA applied based on the Act's definition of an "Indian child." The Act, specifically 25 U.S.C. § 1913(c), allows J.L. to withdraw her consent to the adoption for any reason until a final decree of adoption is rendered. As no final decree had been rendered, the court found that J.L. was entitled to withdraw her Voluntary Act of Surrender For Adoption.
Nevertheless, the court found another provision, § 1916, necessitated a best interest determination before returning custody to J.L., and noted its inherent authority to consider the child's best interest. The court apparently considered state law as well in weighing the best interest issue. Based on the evidence presented at trial, the court concluded that A.S.L.'s best interest would be served by remaining in the custody of the Hamptons. In addition, the court determined it had been shown beyond a reasonable doubt that the continued custody by J.L. would result in serious emotional or physical damage to the child. Consequently, the court rejected and dismissed J.L.'s petition for writ of habeas corpus and awarded the Hamptons sole care, custody and control of A.S.L., subject to reasonable visitation by J.L. at the Hamptons' residence by agreement of the parties. The judgment also reflected J.L.'s request at trial to dismiss her motion to dismiss the adoption proceedings, and the court's ruling dismissing the motion with prejudice.
J.L. appeals that portion of the judgment denying the return of A.S.L. to her and granting sole custody to the Hamptons. Specifically she urges the trial court erred in failing to comply with the clear mandate of § 1913(c), improperly relying on § 1916 to deny the return of custody, and finally, failing to apply the child placement preferences in § 1915(a). The Hamptons answered the appeal, seeking reversal of the judgment insofar as the trial court found the ICWA applied and it allowed J.L. to withdraw her Voluntary Act of Surrender For Adoption. They contend the ICWA is inapplicable because this adoption proceeding does not involve the "breakup of an Indian family," the concern Congress sought to eliminate by the Act.

Discussion
Before we can address J.L.'s arguments under the ICWA, we must first determine whether the Act applies in the instant case. The issue is one of first impression in Louisiana.
The enactment of the ICWA in 1978 stemmed from the rising concern in the mid-1970's over "abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." *334 Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 32, 109 S.Ct. 1597, 1600, 104 L.Ed.2d 29 (1989). Hearings before the Senate Select Committee on Indian Affairs focused not only on the harm to Indian parents and their children involuntarily separated from their families, but also on the impact that massive removal of Indian children had upon the Indian tribes themselves. Holyfield, supra.
Culturally, the chances of Indian survival are significantly reduced if our children, the only real means for the transmission of the tribal heritage, are to be raised in non-Indian homes and denied exposure to the ways of their People. Furthermore, these practices seriously undercut the tribes' ability to continue as self-governing communities.
Holyfield, supra, (quoting Hearings on S. 1214 before the Subcommittee on Indian Affairs and Public Lands of the House Committee on Interior and Insular Affairs, 95th Cong., 2d Sess., at 193 (1978)).
In enacting the ICWA, Congress expressly declared its policy "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families." 25 U.S.C. § 1902. This policy is obviously based on Congress' findings:
[t]hat an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families. 25 U.S.C. & sect; 1901(4), (5).
The ICWA provides for exclusive tribal court jurisdiction for children domiciled or residing on a reservation, and concurrent but presumptively tribal jurisdiction in other cases. 25 U.S.C. § 1911(a), (b). For custody proceedings in state courts, the Act sets forth certain procedural and substantive safeguards to follow. See 25 U.S.C. § 1901 et seq.
The ICWA thus, in the words of the House Report accompanying it, seeks to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society. It does so by establishing a Federal policy that, where possible, an Indian child should remain in the Indian community, and by making sure that Indian child welfare determinations are not based on a white, middle-class standard which, in many cases, forecloses placement with [an] Indian family.
Holyfield, supra, (quoting H.R.Rep. No. 95-1386, at 23-24, 1978 U.S.C.C.A.N. 7545-7547) (citations omitted).
In an early interpretation of the ICWA, the Kansas Supreme Court noted that the underlying thread running through the entire Act is the concern over removing Indian children from "an existing Indian family unit and the resultant breakup of the Indian family." In re Adoption of Baby Boy L., 231 Kan. 199, 206, 643 P.2d 168 (1982). Based on a review of the Act and its legislative history, the Court concluded that this was Congress' clear intent in enacting ICWA; the act was never intended to apply where the preservation of an "Indian family or environment" was not at stake. This analysis has been favorably cited and relied upon by the Supreme Courts of other states. Matter of Adoption of Crews, 118 Wash.2d 561, 825 P.2d 305 (1992); Matter of S.C., 833 P.2d 1249 (Okl.1992); Matter of Adoption of T.R.M., 525 N.E.2d 298 (Ind.1988).
J.L. urges we decline to follow this view, which has been termed by some as a "judicially created exception" to the ICWA. See Matter of Baby Boy Doe, 123 Idaho 464, 849 P.2d 925 (1993). However, upon exhaustive review of jurisprudence on this issue, the Act, and its stated purpose and legislative history, we are convinced that Congress intended the Act apply only in situations involving *335 the removal of children from an existing Indian family and Indian environment. See Matter of S.C., supra at 1255. Bolstering our conclusion is the Senate Committee on Indian Affairs' rejection in 1987 of proposed amendments to mandate application of the ICWA regardless of whether the child had previously lived in Indian country, in an Indian cultural environment or with an Indian parent. See S.1976, 100th Cong., 1st Sess., 133 Cong.Rec. S18532, S18533 (daily ed. Dec. 19, 1987) (proposed amendment to Section 1903(1)). Contrary to J.L.'s assertion that this view undermines the remedial effect and purpose of the Act, requiring an existing Indian family and environment to exist for application of the Act promotes the specific goal Congress sought to achieve. The ICWA protects and promotes Indian tribal heritage and retains the cultural ties between children and their Indian parents and the tribe, when such ties exist.
J.L. urges we adopt the Idaho Supreme Court's reasoning in Matter of Baby Boy Doe, supra. There the non-Indian mother consented to voluntary termination of her parental rights and to the adoption of her illegitimate son. The natural Indian father contested the adoption. The trial court found that the ICWA did not apply because either the child was not an "Indian child" under the Act or was not being removed from an existing Indian family, terminated the Indian father's parental rights and granted the adoption. The appellate court affirmed on different grounds. The Supreme Court reversed, finding the Act applied because the baby was an "Indian child" under the ICWA. It rejected the application of the Indian family requirement because
it would allow the non-Indian mother to circumvent application of ICWA and the tribe's interest in the child by making sure that the child is kept away from the reservation and out of contact with the father and his family. This would undermine the tribe's interest in its Indian children, which the Supreme Court recognized in Mississippi Choctaw.

Matter of Baby Boy Doe, supra 849 P.2d at 931-932.
In the instant case, however, the Indian mother is not seeking to circumvent the ICWA or to undermine the tribe's interest by keeping the child away from the reservation. It is therefore also distinguished from Holyfield, supra, which J.L. argues implicitly rejected the existing family requirement. There the Court dealt with illegitimate twins born to parents who lived on a reservation, but purposely left the reservation to give birth and then voluntarily surrendered the children for adoption to a non-Indian couple. The Court held that the children were domiciled on the reservation because both parents lived on the reservation, despite their attempt to defeat the exclusive tribal jurisdiction under the ICWA by removing the children from the reservation. The Court, citing the negative impact on the long-term survival of the tribe and the effect on the children removed from their cultural setting, found that "Congress determined to subject such placements to the ICWA's jurisdictional and other provisions, even in cases where the parents consented to an adoption, because of concerns going beyond the wishes of individual parents." Holyfield, supra 490 U.S. at 50, 109 S.Ct. at 1609. We note that Holyfield dealt with only the issue of jurisdiction under the ICWA and therefore may be construed narrowly; however, even assuming the holding extends to the instant case, we find it supports the existing family requirement. See Matter of Adoption of Crews, supra 825 P.2d at 310.
We find persuasive the decisions of the Supreme Courts of Washington and Indiana, which involved factually similar situations to the instant case. Matter of Adoption of Crews, supra; Matter of Adoption of T.R.M., supra. In Crews, decided after Holyfield, the Washington Supreme Court found that the ICWA did not apply to invalidate the termination of an Indian mother's parental rights to her illegitimate child under state law. The Indian mother consented to terminate her parental rights and to the adoption. A few days after the child's birth she relinquished custody to the adoptive non-Indian couple. Shortly thereafter she contacted the couple and requested return of her child. She subsequently learned of her Indian ancestry and her child's eligibility to enroll in *336 the Choctaw Nation Tribe, sought to revoke her consent under the ICWA, and filed a petition to vacate the order terminating her parental rights and to regain custody of her child. The trial court rejected her petition finding the Act did not apply because the baby was not an "Indian child" at the time the termination order was entered. The tribe intervened on appeal. The Court of Appeals affirmed the lower court. The Supreme Court found that the ICWA did not apply in this case even if the baby was an "Indian child" because the baby was not removed from an existing Indian environment. The court noted:
Neither Crews nor her family has ever lived on the Choctaw reservation in Oklahoma and there are no plans to relocate the family from Seattle to Oklahoma. Bertiaux, B.'s father, has no ties to any Indian tribe or community and opposes B.'s removal from his adoptive parents. Moreover, there is no allegation by Crews or the Choctaw Nation that, if custody was returned to Crews, B. would grow up in an Indian environment. To the contrary, Crews has shown no substantive interest in her Indian heritage in the past and has given no indication this will change in the future.
Crews, supra 825 P.2d at 310. The Court also noted "there may be instances where the application of ICWA would result in the placement of an Indian child back into an Indian environment." Crews, supra 825 P.2d at 311. However, under these particular circumstances, it held the Act did not apply.
In the Matter of Adoption of T.R.M., supra, the Indiana Supreme Court also found the ICWA did not apply to invalidate an adoption. The Indian mother, J.Q., a member of the Oglala Sioux Indian Tribe gave birth to T.R.M., whose paternity was never established, and six days later asked the non-Indian adoptive couple to take the child. J.Q. signed a consent form to the adoption and except for a few phone calls and letters had no further contact with the child or the adoptive parents until she filed a habeas corpus proceeding for return of her child. The tribal court also filed an action claiming jurisdiction in the Oglala Sioux Tribal Court. The court denied her petition, granted temporary custody to the adoptive parents, and dismissed the tribe's petition for failure to appear. The adoptive parents filed a petition for adoption and the tribe filed a motion to transfer jurisdiction to the tribal court. The court granted the adoption. The appellate court reversed on jurisdictional grounds. The Supreme Court reinstated the trial court's judgment, finding the ICWA inapplicable. In holding that the Act should not be applied in a case where the purpose and intent of Congress cannot be achieved, it stated:
[T]he child's biological ancestry is Indian. However, except for the first five days after birth, her entire life of seven years to date has been spent with her non-Indian adoptive parents in a non-Indian culture. While the purpose of the ICWA is to protect Indian children from improper removal from their existing Indian family units, such purpose cannot be served in the present case before this Court. From the unique facts of this case, where the child was abandoned to the adoptive mother essentially at the earliest practical moment after childbirth and initial hospital care, we cannot discern how the subsequent adoption constituted a "breakup of the Indian family."
Matter of Adoption of T.R.M., supra at 303.
In the instant case, J.L. asked the adoptive couple to take custody of A.S.L. the day after she was born. J.L. had the baby in Shreveport, not on a reservation, and remained in Shreveport only until the end of August 1994. A.S.L.'s paternity has not been conclusively established; it is questionable whether the father is Indian. A.S.L. has lived with the Hamptons in Bossier virtually since birth. J.L. has not lived on a reservation since age nine, although she has, in the past year, attended two pow wows. She has maintained no ties to the Indian tribe. Since revoking her consent to the adoption, she claims she wants to "get back into [her] cultural heritage," move back to the reservation and rear her child in the Indian way. Her actions however, in the past and even since the birth of A.S.L., suggest *337 quite the opposite. Similar to Crews, J.L. has shown little substantive interest in her Indian heritage in the past, and given no indication, other than a bare assertion, that this will change in the future. Crews, supra at 310. Furthermore, we note that the tribe to date has not filed a formal intervention and appears to have declined involvement in the case. In sum, we find that the adoption of A.S.L. will not cause the breakup of an existing Indian family or removal of a child from an Indian environment. The child has never participated in Indian culture or heritage and more importantly based on the evidence presented, would not be exposed to such culture in the future even if returned to her biological mother or her family.
We therefore conclude that the ICWA was not intended to apply to this particular set of circumstances, and that the trial court committed an error of law.[2] Accordingly, we are constrained to reverse that portion of the trial court judgment decreeing that the Act applies, and allowing J.L. to revoke her Voluntary Act of Surrender For Adoption under federal law.
Because we find the ICWA does not apply, we need not address J.L.'s arguments under federal law. J.L. does not contest the validity of the surrender under state law, which renders her consent to the adoption and the termination of her parental rights final and irrevocable. La.Ch.C. arts. 1122B(4), (5), (6), 1123, 1130. The law is clear that J.L. may not revoke her consent. J.L.'s Voluntary Act of Surrender For Adoption executed on August 18, 1994 is therefore valid.

Conclusion
We reverse that portion of the judgment decreeing the ICWA applies and allowing J.L. to revoke her Voluntary Act of Surrender For Adoption. The judgment in all other respects is affirmed. We note the grant of visitation to J.L. was made pursuant to the parties' agreement; therefore, though unusual and not provided for by law in adoption cases, we will not disturb the judgment on the issue. The case is remanded to the trial court to proceed with the adoption. Costs are assessed to J.L. in accordance with La. C.C.P. art. 5181 et seq.
REVERSED IN PART; AFFIRMED IN PART; CASE REMANDED.
STEWART, Judge, dissenting.
While I fully sympathize with the majority's desire to reach the result that it has reached, this is a classic case of the end not justifying the means. I am afraid that the Court has driven another nail in the coffin of the Indian Nation by departing from the clear wording of the ICWA and by concluding that the Act applies only in situations involving "the removal of children from an existing Indian family and Indian environment."
The provisions of 25 U.S.C. § 1913(c) state:
In any voluntary proceeding for termination of parental rights to, or adoptive placement of, an Indian child, the consent of the parent may be withdrawn for any reason at any time prior to the entry of a final decree of termination or adoption, as the case may be, and the child shall be returned to the parent. (Emphasis added.)
The adoption proceeding herein is a "voluntary proceeding for ... adoptive placement" by definition under the Act. See 25 U.S.C. § 1903(1). A.S.L. is "an Indian child" by definition under the Act. See 25 U.S.C. § 1903(4). J.L. is a "parent" by definition under the Act. See 25 U.S.C. § 1903(9). *338 Nor is there any question that J.L.'s consent was "withdrawn ... prior to the entry of a final decree of ... adoption", as required by the Act. I find the wording of the Act both clear and clearly applicable in this case.
Under Louisiana law, when the wording of a statute is clear and free of ambiguity, the letter of it shall not be disregarded under the pretext of pursuing its spirit. LSA-R.S. 1:4. This virtually universal rule of statutory construction is found in federal law as well. As stated by the United States Supreme Court in Freytag v. C.I.R., 501 U.S. 868, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991):
When we find the terms of a statute unambiguous, judicial inquiry should be complete except in rare and exceptional circumstances.... We have stated that courts `are not at liberty to create an exception where Congress has declined to do so.' (citation omitted). 501 U.S. at 873, 111 S.Ct. at 2636.
There is no exception in the ICWA for situations not involving "the removal of children from an existing Indian family and Indian environment." Instead, the "Indian family" exception is of judicial origin.
In Re Adoption of S.S., 252 Ill.App.3d 33, 190 Ill.Dec. 802, 622 N.E.2d 832 (2 Dist.1993), the court held the ICWA applied to a petition for adoption of children of an Indian mother and deceased non-Indian father filed by the father's sister and her husband, even though the children resided with the father and a paternal aunt at the time of the father's death and thus were not part of an "Indian family." In reaching its holding, the court began by reviewing the language of the Act, and discussing the line of cases applying the "Indian family" exception. The court then noted that a number of decisions have questioned the soundness of the exception, particularly in light of the policy analysis undertaken by the United States Supreme Court in Mississippi Band of Choctaw Indians v. Holyfield (1989), 490 U.S. 30, 109 S.Ct. 1597, 104 L.Ed.2d 29. After discussing and considering the reasoning of the various decisions on application of the ICWA, the court concluded that the trial court erred in holding that the ICWA did not apply:
We are troubled in no small measure by an approach which departs from the clear language of the statute based upon a generalized policy analysis. The provisions at issue are unambiguous and the case at bar is undeniably within their scope.... Congress imposed no express requirement that children be part of an Indian family in order for these provisions to apply; this limitation on the scope of the ICWA is entirely a judicial creation with no basis in the language of the ICWA.
The court went on to hold that even if it were appropriate to look beyond the plain language of the statute, the court's decision would be no different:
As the Supreme Court's decision in Holyfield clearly demonstrates, and has been recognized by a number of courts, Congress enacted the ICWA not only to protect Indian children and parents, but also to protect the tribes themselves. Imposing an "existing Indian family" requirement under the circumstances of this case is "directly in conflict with the idea of tribal sovereignty and the policy of improving tribal ties reflected in ICWA." (citation omitted).
I believe that the analysis employed in Adoption of S.S. is correct in rejecting the "Indian family" exception because: (1) the exception runs counter to the plain language of the Act; and, (2) even when the policies underlying the Act are taken into account, application of the "Indian family" exception fails to give adequate consideration to the interest of the Indian tribes themselves.
The congressional findings underlying the Act, set forth at 25 U.S.C. § 1901, include the following:
(2) That Congress, through statutes, treaties, and the general course of dealing with Indian tribes, has assumed the responsibility for the protection and preservation of Indian tribes and their resources;
(3) That there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe;

*339 (4) That an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by non-tribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and,
(5) That the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families. (emphasis added).
While finding (4) above shows that Congress was indeed concerned with the breaking up of Indian families, findings (2), (3) and (5) show that Congress also was concerned with the protection, preservation and integrity of Indian tribes and the essential tribal relations of Indian people. This is a point that did not go unnoticed by the United States Supreme Court in Holyfield, supra.
In Holyfield, a petition was filed for adoption of twin illegitimate babies whose parents were enrolled members of the Choctaw Indian Tribe and were residents and domiciliaries of the tribal reservation in Mississippi. Although both parents executed a consent-to-adoption form in state court, and a final decree of adoption subsequently was rendered, the Tribe later moved to vacate the adoption decree on the ground that under the ICWA exclusive jurisdiction was vested in the tribal court. The Chancery Court overruled the tribe's motion, and the Mississippi Supreme Court affirmed. However, the United States Supreme Court reversed, holding in pertinent part that the children were domiciled on the reservation within the meaning of the ICWA's exclusive tribal jurisdiction provision, even though the children were never physically present on the reservation, and even though the children were voluntarily surrendered for adoption. In discussing the effect of the mother's "voluntary surrender" the court stated:
Nor can the result be any different simply because the twins were "voluntarily surrendered" by their mother. Tribal jurisdiction under § 1911(a) was not meant to be defeated by the actions of individual members of the tribe, for Congress was concerned not only about the interest of Indian children and families, but also about the impact on the tribes themselves of the large numbers of Indian children adopted by non-Indians. See, 25 U.S.C. §§ 1901(3) ("[T]here is no resource that is more vital to the continued existence and integrity of Indian tribes than their children"), 1902 ("promote the stability and security of Indian tribes"). The numerous prerogatives accorded the Indian tribes through the ICWA's substantive provisions, e.g., §§ 1911(a) (exclusive jurisdiction over reservation domiciliaries), 1911(b) (presumptive jurisdiction over non-domiciliaries), 1911(c) (right of intervention), 1912(a) (notice), 1914 (right to petition for invalidation of state-court action), 1915(c) (right to alter presumptive placement priorities applicable to state-court actions), 1915(e) (right to records), 1919 (authority to conclude agreements with States), must, accordingly, be seen as a means of protecting not only the interests of individual Indian children and families, but also of the tribes themselves.
Among the above-listed prerogatives, notice to the Indian tribe under § 1912(a) is of particular importance in this case. That section provides in pertinent part:
In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested of the pending proceedings and of their right of intervention.
Without question this case involves an involuntary proceeding in a State court where the court knows that an Indian child is involved. Yet under the majority's view herein, it's unnecessary to notify the Indian tribe of an opportunity to intervene to protect its interest in a resource vital to its very existence.
*340 In contrast to the notice required in involuntary proceeding, notice to the tribe is not required under the Act in voluntary proceedings. The obvious conclusion to be drawn from the contrast is that Congress on the one hand recognized the superior position of the parent's desires in a voluntary proceeding. On the other hand Congress must have recognized that an involuntary proceeding would not be brought unless the parent at least allegedly had abused, abandoned, or neglected the child to such an extent that the State could take the child from the parent. In this situation, the tribe's rights become a central focus because if the parent no longer should be allowed to shape the child's future, the tribe should have the opportunity to do so.
However, under the "Indian family" exception, the tribe's right to notice under § 1912(a) only would come into play when the parent is both a "good Indian" who is raising the child in an "Indian family environment" and exposing the child to Indian culture, and a "bad Indian" who is so lacking as a parent that parental rights are in jeopardy of being involuntarily terminated. The intersection of these two sets, if it contains any elements at all, is so small as to effectively allow the exception to swallow the rule.
Furthermore, if Congress only was concerned about removing Indian children from "an existing Indian family unit and the resultant breakup of the Indian family" (Baby Boy L., supra), why did Congress give a "parent" the unequivocal right to revoke consent to adoption for any reason, while defining "parent" to specifically exclude "the unwed father where paternity has not been acknowledged or established"? I conclude, Congress was aware that an adoption most often involves a single parent who consents to adoption shortly after the child's birth, and not the breakup of an existing family unit.
The majority opinion would distinguish Holyfield, supra, because J.L. is not seeking to circumvent the ICWA or undermine the tribe's interest in keeping the child away from the reservation. The opinion then goes on to note that Holyfield, "may be construed narrowly" as dealing only with jurisdiction, and that even if its holding extends to this case, it supports the existing family requirement. To me the importance of Holyfield lies in its analysis of the policies underlying the Act and its emphasis on Congress' concern not only for Indian children and families, but also the tribes themselves. I conclude that this analysis strongly undermines, rather than supports, the "Indian family" exception. I also conclude that J.L.'s not seeking to circumvent the ICWA or undermine the tribe's interest should be viewed as points in her favor rather than reasons to exclude her from the Act's coverage.
The majority opinion also finds that its conclusion as to congressional intent is bolstered by a Senate committee's rejection in 1987 of proposed amendments to the ICWA. I consider this as a slender reed upon which to rest the weight of a decision to depart from the clear language of the Act. In Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), Firestone contended that congressional action after the passage of ERISA indicated that Congress intended ERISA claims to be reviewed under the arbitrary and capricious standard. At a time when most federal courts had adopted this standard, a bill was introduced to amend the legislation by providing de novo review of decisions denying benefits. Because the bill was never enacted, Firestone asserted that the Supreme Court should conclude Congress was satisfied with the arbitrary and capricious standard. In finding a de novo standard applied, the Supreme Court gave little weight to Firestone's argument:
The bill's demise may have had nothing to do with Congress's view on the propriety of de novo review. Without more, we cannot ascribe to Congress any acquiescence in the arbitrary and capricious standard. `[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.' U.S. v. Price, 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960).
Likewise, the demise of proposed amendments to the ICWA well may have had nothing to do with Congress's view on the propriety of the "Indian family" exception. Without more I cannot ascribe such an intent to *341 Congress, especially where the proposed amendments apparently were never placed before the whole Congress, but only a committee.
Finally, and perhaps most troubling of all, is the perverse effect that can result when the plain wording of the Act is abandoned. I conclude that any mother of an Indian child who reads or otherwise is aware of the provisions of § 1913(c) easily could rely on the language to take a large first step toward termination of her parental rights, reasoning that she could change her mind for any reason at any time prior to the entry of a final decree. However, if she then seeks to revoke her consent, she might well discover that, according to the "Indian family" exception, the Act really does not mean what it says, at least with regard to her. I find this trap particularly egregious because it effectively takes a legal provision intended as a shield for the mother and turns it into a sword that can be used to partially sever the legal rights of a parent to her child.
Before turning to what I conclude is the correct analysis, I would note the lack of any clear standards by which to apply the "Indian family" exception, and the resultant broad discretion that inevitably would tempt courts to impose their own views of justice and goodness upon others. As the "Indian family" line of cases shows, this temptation is all but irresistible.
In matter of adoption Crews, supra, case prominently discussed in the majority opinion, the court noted several factors in support of applying the exception: (1) neither Crews nor her family ever lived on a reservation and there were no plans to relocate the family; (2) the father had no ties to an Indian tribe and opposed the child's removal from the adoptive parents; (3) there was no allegation by Crews or the tribe that, if custody were returned to Crews, the child would grow up in an Indian environment; and (4) Crews had shown no substantive interest in her Indian heritage and had given no indication that this would change in the future.
The facts of Crews are ideally suited for attempting to support an exception. Still, they are not a basis for ignoring the tribe's interests or the Act's language, and the case-by-case approach encouraged by the analysis will offer no protection in another case where the facts likely will be different and weaker. For example, while neither Crews nor her family ever lived on a reservation, J.L. was born on a reservation; she and her family lived there for nine years. While Crews had no plans to go back to the reservation, J.L. testified that she planned to return to the reservation. The father in Crews opposed removal from the adoptive parents; the same is not true herein. Furthermore, there was no allegation in Crews that if custody was returned to the mother, the child would grow in an Indian environment. The opposite is true here. Similarly, where Crews had shown no substantive interest in her Indian heritage and gave no indication that this would change in the future, J.L. showed at least some interest by attending two pow-wows in the past year, and testified she planned to rear her child in the Indian way. Yet the majority had no trouble concluding J.L. had shown "little substantive interest" in her heritage, and dismissing her testimony has "a bare assertion". To me all of this shows how utterly impotent the protections intended by the ICWA would be if an "Indian family" exception is recognized. Accordingly, I must dissent from what I view as judicial legislation. Hard cases do indeed make bad law.
Because I would affirm the trial court's decision to apply the provisions of the ICWA and allow the mother to withdraw her consent to the adoption, I now turn to that portion of the trial court's judgment denying the mother's Writ of Habeas Corpus and awarding sole care, custody and control of the child to the Hamptons, subject to the mother's reasonable visitation.
The trial court relied upon the provisions of 25 U.S.C. § 1916 as necessitating a best interest determination before returning custody to the mother. The court refused to return custody to her after determining that, beyond a reasonable doubt, giving custody to the mother would result in serious emotional or physical damage to the child. Although I conclude that the trial court erred in relying on the provisions of § 1916 to *342 refuse the return of custody to the mother, I further conclude not only that the trial court correctly determined giving custody to the mother at that time would result in serious emotional or physical damage to the child, but also that the trial court could validly order an emergency placement of the child pursuant to § 1922 of the ICWA.
Under the provisions of § 1916, whenever a final decree of adoption of an Indian child has been vacated or set aside, a biological parent may petition for return of custody, and the court shall grant such petition unless there is a showing, in a proceeding subject to the provisions of § 1912, that such a return of custody is not in the best interest of the child. This section has no application in the instant case because there was never a final decree of adoption. Once a final decree of adoption of an Indian child has been rendered, not only does the mother no longer have existing parental rights to the child, but the mother no longer has the very potent right afforded by § 1913 to withdraw consent to adoption for any reason at any time prior to the entry of a final decree. Thus, it is understandable that in such circumstances a return of custody to the mother could be subject to a best-interest-of-the-child test.
At the same time, even when the mother validly withdraws her consent pursuant to § 1913(c), the court is not without power to refuse a return of custody. The provisions of § 1922 state:
Nothing in this subchapter shall be construed to prevent the emergency removal of an Indian child who is a resident of or is domiciled on a reservation, but temporarily located off the reservation, from his parent of Indian custodian or the emergency placement of such child in a foster home or institution, under applicable State law, in order to prevent imminent physical damage or harm to the child. The State authority, official, or agency involved shall insure that emergency removal or placement terminates immediately when such removal or placement is no longer necessary to prevent imminent physical damage or harm to the child and shall expeditiously initiate a child custody proceeding subject to the provisions of this subchapter, transfer the child to the jurisdiction of the appropriate Indian tribe, or restore the child to the parent or Indian custodian, as may be appropriate.
Although the above-quoted section by its terms applies only to an Indian child who is a resident of or is domiciled on a reservation, but temporarily located off the reservation, it is implicit that "emergency removal" authority extends to non-reservation Indian children; the legislative history bears this out. (H.B. 1386, 95 Cong., 2d Sess. 25). State ex rel Juvenile Department of Multnomah County v. Charles, 688 P.2d 1354, 70 Or.App. 10 (1984). The ICWA does not prevent the emergency removal of an Indian child under state law, and does not require notice in that situation to the parents and the tribe until a custody proceeding is initiated. State ex rel Juvenile Department of Clackamas County v. Charles, 810 P.2d 393, 106 Or.App. 637 (1991).
Under the peculiar circumstances of the instant case, where the mother initially gave the Hamptons physical custody voluntarily, and the court subsequently determined based on abundant, convincing evidence that giving custody to the mother would result in serious emotional or physical damage to the child, I conclude that under § 1922 the court's decision not to return custody to the mother involved an emergency placement of the child subject purely to the provisions of applicable Louisiana law.
Pertinent provisions of Louisiana law are found in the child-in-need-of-care provisions of Title VI of the Louisiana Children's Code. The Title, the purpose of which is to protect children whose physical or mental health and welfare are substantially at risk of harm, is to be administered and interpreted to avoid trauma to the child and unnecessary interference with family privacy, and yet, at the same time, authorize the protective and preventive intervention needed to safeguard and enhance the health and well-being of children. LSA Ch.C. Art. 601. Although the purposes of the child-in-need-of-care provisions plainly encompass the risk of harm presented herein, the highly unusual factual posture of this case requires interpretation of *343 how this case falls under the procedures provided for the protection of a child.
Ordinarily, such procedures are initiated through child abuse reporting and investigation in situations where children are in the physical custody of a parent or parents. In the instant case, the child has not been in the physical custody of the mother since shortly after its birth, the initial removal of the child from the mother's custody was voluntary, and the factual information showing the need for protective and preventive intervention resulted from court proceedings arising out of the mother's withdrawal of consent to adoption. Nevertheless, after reviewing the provisions of articles 618-627 of the Children's Code, I conclude that the current procedural posture of this case closely approximates that resulting from a continued custody order under Children's Code Art. 627. Compare State In Interest of Davis, 379 So.2d 831 (La.App. 4th Cir.1980) decided under the Code of Juvenile Procedure.
Such a continued custody order is temporary in nature, and if the district attorney intends to file a petition to commence child-in-need-of-care proceedings pursuant to Art. 631 of the Children's Code, then such a petition must be filed within 30 days of the hearing to determine continued custody. For good cause shown, the time for filing the petition may be extended by the court, but if no petition is filed within the applicable time period, the child shall be returned to the parent.
These Louisiana codal provisions dovetail with the requirements of § 1922 of the ICWA requiring that the state authority, official or agency involved shall insure that the emergency removal or placement terminates immediately when such removal or placement is no longer necessary to prevent imminent physical damage or harm to the child and shall expeditiously initiate a child custody proceeding subject to the provisions of the ICWA. Under the unique circumstances of this case, I would hold that the district attorney for the 26th Judicial District had 30 days from the date of this opinion in which to file a petition to commence child-in-need-of-care proceedings, if the district attorney determined that such action should be taken. In addition to following all the procedural requirements of Louisiana law, I would hold that all future court proceedings also would be subject to and must follow the requirements of 25 U.S.C. § 1912.
To avoid any possible confusion in the future, I would observe that a distinction must be made between the foster care placement referred to in § 1912(d), which must be preceded by active efforts to provide remedial services and rehabilitation programs, and the emergency placement of a child in a foster home under applicable state law, referred in the provisions of § 1922, which is designed to prevent imminent physical damage or harm to the child. Louisiana law also contains such a distinction.
Under the provisions of Children's Code Art. 626(B), a court considering the authorization of continued custody of a child prior to adjudication must determine whether the Department of Social Services has made reasonable efforts to prevent or eliminate the need for removal of a child from his home and, after removal, to make it possible for the child to return home. However, if the department's first contact with the family occurred during an emergency in which the child could not safely remain at home even with reasonable in-home services provided to the family, the Department is deemed to have made reasonable efforts, and the court may authorize the removal of the child even if the Department's efforts have not been reasonable. Children's Code Art. 622(C) and (D). These codal provisions are in pari materia with those of § 1922 of ICWA.
In contrast, once a child-in-need-of-care petition has been filed, the permanency planning provisions found in Chapter 13 of the Children's Code show that a case plan must be developed detailing the custodian's efforts toward achieving a permanent placement for the child, and that the case plan must include a plan which, in part, assures that services are provided to the parents, child and foster parents in order to improve the conditions in the parents' home, facilitate return of the child to his own home or the permanent placement of the child, and address the needs of the child while in foster care, including a discussion of the appropriateness of the services *344 that have been provided to the child under the plan. See Children's Code Arts. 671-677. Furthermore, under the provisions of Children's Code Art. 682, a court shall not remove a child from the custody of his parents unless his welfare, in the opinion of the court, cannot be adequately safeguarded without such removal. In support of any disposition removing a child from the parental home, a court must determine whether the Department has made reasonable efforts to prevent or eliminate the need for removal of the child from his home, and, after removal, to make it possible for the child to return home. See also, Children's Code Art. 684. I conclude that the above discussed Children's Code provisions are in pari materia with requirements found in § 1912(d) of the ICWA.
An additional matter warranting discussion concerns the grounds for alleging that a child is in need of care under the provisions of LSA-Ch.C. Art. 606. As previously mentioned, the circumstances of this case easily fall within the scope of the purpose of the child-in-need-of-care legislation, set forth in Art. 601, which authorizes protective and preventive intervention when needed to safeguard and enhance the health and well-being of children. However, the Children's Code currently contemplates two alternative means of transfer of child custody: (1) involuntary transfer under child-in-need-of-care articles; and (2) voluntary transfer under Articles 1510, et seq.
Under Article 606, the law contemplates removal of custody from a parent where the child is a victim of abuse, neglect, etc., while under Article 1510, et seq., the law contemplates a voluntary transfer pursuant to the revocable consent of the parent, in order for a child to receive adequate care and treatment. Our law does not contemplate this unique situation arising under the ICWA in which a court can be faced with the prospect of returning custody of a child to a parent who has not yet had an opportunity to place the child at substantial risk of imminent harm, but whose custody, as shown by clear and convincing evidence received in proceedings spawned by the ICWA, would likely result in the child's suffering serious emotional or physical damage.
Because Louisiana law does not contemplate this unusual situation, the judiciary must interpret the law in accordance with the intent of the legislature. I observe that when return of custody is being considered following the parent's revocation of voluntary consent to a transfer under Louisiana law, the court must consider the best interest of the child, including such factors as the length of the parent/child separation, and the current fitness of the parent. LSA-Ch.C. Art. 1523. Thus, I conclude that the intent of the legislature could not be a return of custody without any regard for the child's interests.
Considering the importance of a parent's custody rights, the involuntary nature of the current proceedings, and the intent of both the ICWA and Louisiana law, I conclude that the question of return of custody is not subject simply to a best interest determination under Article 1523, but that the grounds of Article 606 should be applied herein even though the child has not yet suffered abuse, neglect, etc. I hasten to emphasize the limited nature of my conclusion applicable to the unique facts of this case. Moreover, I conclude that in order to harmonize the provisions of LSA-Ch.C. Art. 606 with those of 25 U.S.C. § 1912(e), the trial court would have to find by clear and convincing evidence that one of the grounds listed in Article 606 is likely to result if custody is returned to the mother.

Conclusion
In this case the trial court judgment allowed J.L. to withdraw her consent to adoption under the provisions of ICWA, but denied her writ of habeas corpus. For the foregoing reasons, I would affirm this portion of the trial court's judgment. The trial court also awarded sole care, custody and control of A.S.L. to the Hamptons, subject to the mother's reasonable visitation. An appeal lies from the judgment itself and not the reasons for judgment. White v. McCoy, 552 So.2d 649 (La.App. 2d Cir.1989). I find no error in this portion of the trial court's judgment, except to the extent that such custody is of indeterminate duration. Accordingly, I would amend the trial court's judgment in this respect, and, as previously discussed, I would send a copy of this opinion to the *345 district attorney for the 26th Judicial District giving him 30 days from the date of this opinion in which to file a petition commencing child-in-need-of-care proceedings. My opinion should not read as requiring the filing of such a petition, or as eliminating the possibility of informal adjustment procedures under the Children's Code. If child-in-need-of-care proceedings were initiated by the district attorney, then such proceedings would be subject not only to the provisions of Louisiana law, but also to the provisions of § 1912 of the ICWA, including notice to the tribe.
The provisions of 25 U.S.C. § 1902 state:
The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs. (Emphasis added.)
The majority opinion ignores this policy and reverts to the antiquated frontier mentality of "excepting" away the greater rights of Indians to supposedly protect the lesser rights of others. Although unintentional, the condescending "Indian family" exception will only serve to further decimate what little stability is left for the Indian nation. James and Jan Hampton understood that they were attempting to adopt an Indian child. They also knew that the child and his mother had a special status. It is wrong to attempt to ignore this now. The majority opinion, which uses "whatever means necessary," to protect the Hamptons is also wrong. Since "two wrongs do not make a right," I respectfully dissent.
STEWART, J., dissents with written reasons.
WILLIAMS, J., dissents for the reasons assigned by STEWART, J.

APPLICATION FOR REHEARING
Before SEXTON, NORRIS, LINDSAY, WILLIAMS and STEWART, JJ.
Rehearing denied.
NOTES
[1] According to counsel for J.L., the Tribe now seeks to intervene in the matter and transfer the proceedings to the Cheyenne River Sioux Tribal Court in Eagle Butte, South Dakota. We find no record evidence of this intent; any request for intervention or transfer of jurisdiction, if filed, was never made a part of the record on appeal.
[2] In so holding we are naturally sensitive to the dissent's critique that we are utilizing a judicial exception to circumvent the "plain meaning" of 25 U.S.C. § 1903. We do not feel, however, that the exception drives "another nail in the coffin" of the Indian Nation; in the instant record there is no evidence whatsoever that J.L.'s tribe sought to intervene in the proceedings or affect the outcome in any way. We also differ with the dissent's view that our holding violates ICWA in the pursuit of a "result" any the less than the dissent's approach. After nine pages urging us to follow the letter of ICWA and find that it must apply, the dissent then circumvents the plain meaning of § 1913(c), under which the child must be returned to the parent who revokes her consent. The dissent's effort to interlard the Louisiana Children's Code into the framework of ICWA is but tenuously supported and represents an unprecedented, uncharted path in ICWA jurisprudence; as such it is hardly less offensive to the Federal Statute than the well-recognized "Indian family exception."