[No. H016859. Sixth Dist. Nov. 26, 1997.]

CRYSTAL R., a Minor, etc., et al., Petitioners, v.
THE SUPERIOR COURT OF SANTA CRUZ COUNTY, Respondent, v.
COLLEEN C. et al., Real Parties in Interest.

**COUNSEL**

Sharon Saldavia and Shannon M. Sullivan for Petitioners.

No appearance for Respondent.

Ted Meneice and J. J. Hamlyn III for Real Parties in Interest.

**OPINION**

**BAMATTRE-MANOUKIAN, J.**—Crystal R., the child who is the subject of these dependency proceedings, is seven years old. Her father, who is of Indian heritage, has been incarcerated almost all of her life and barely knows her. Her mother, a non-Indian, tried to raise Crystal by herself but, because of her problems with drug addiction, was unable to provide adequate parenting. Crystal has been cared for throughout these past seven years by her mother's aunt and uncle, who, like the mother, are non-Indian. They have provided the only constant and continuing source of stability in Crystal's life and she has become part of their family in recent years. In this writ petition, Crystal and her de facto parents now ask this court to allow their family ties to become permanent and legal.

In opposition to the petition, Crystal's biological parents contend that the juvenile court must apply the requirements of the Indian Child Welfare Act (the ICWA or the Act) before terminating parental rights and freeing Crystal for adoption by the aunt and uncle. The ICWA, enacted in 1978, was Congress's response to statistics showing a widespread practice of unwarranted removal of Indian children from their families by social services agencies. Congress declared that the policy behind the Act was "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families." (25 U.S.C. § 1902.) This was to be accomplished in part by the establishment of "minimum Federal standards" governing the removal of Indian children from their families and the placement of such children according to preferences for homes reflecting Indian culture. (*Ibid.*)

We do not believe the policies underlying the Act are served by its application in the circumstances before us, where the Indian parent has not been part of the child's life, the record does not reveal that he has maintained any significant ties with Indian culture and the child has formed strong bonds with her non-Indian adoptive parents, who in this case are members of her extended family. Two other California Courts of Appeal have recently refused to apply the special protections of the Act in circumstances where there is no existing Indian family to protect. (*In re Bridget R.* (1996) 41 Cal.App.4th 1483 [49 Cal.Rptr.2d 507] (*Bridget R.*) and *In re Alexandria Y.* (1996) 45 Cal.App.4th 1483 [53 Cal.Rptr.2d 679] (*Alexandria Y.*).) We now join those courts in adopting the "existing Indian family" doctrine.

Accordingly, we will grant the writ petition and return the matter to the juvenile court so that the court may conduct a hearing to determine whether there is factual support to establish that Crystal was part of an existing Indian family, so as to justify the application of the ICWA. In the event that no existing Indian family is found, the court is to proceed with the selection and implementation hearing under state law.

BACKGROUND

Crystal R. was born on October 26, 1990. Her mother and father were not married. In fact, up until several months before Crystal was born, the mother was still formally married to another man. Crystal's mother has struggled with drug addiction most of her adult life. Crystal's father has a lengthy criminal history and has spent much of his adult life in prison. Not surprisingly, the mother and father's relationship has been sporadic and unstable. For example, when Crystal was six months old, the father was placed on parole. The following month he violated parole, and was subsequently

reincarcerated, when he harassed the mother at her home and threatened to take away baby Crystal.

In January of 1993 when Crystal was two years old, she was placed in emergency foster care when the mother was arrested for driving under the influence of heroin. When the mother was released from jail, Crystal was returned to her. The mother refused voluntary services at that time. Two additional referrals to child protective services involved neglect or abuse of Crystal due to the mother's drug use.

The following year, when Crystal was three, the mother violated probation and was arrested for being under the influence of a controlled substance, possessing hypodermic needles, and for child endangerment. The sheriff found the mother and Crystal to be living in a home with many hazards to Crystal's personal safety. Crystal was unclothed and had a fresh cut from a razor.

On January 25, 1994, a petition was filed by the Santa Cruz Human Resources Agency (hereafter, the Agency) alleging that the mother was unable to care for Crystal. (Welf. & Inst. Code, § 300, subd. (b).) An amended petition alleged that the father was incarcerated and had not provided support for his child. (Welf. & Inst. Code, § 300, subd. (g).) According to the social worker's report, the father had never had any significant contact with Crystal. The mother expressed fear of the father and wanted her whereabouts and Crystal's kept confidential.

On February 18, 1994, the petition was sustained, Crystal was declared a dependent of the court and, pursuant to her mother's request, she was placed in the home of the mother's aunt and uncle, who had cared for Crystal at various times since her birth. A case plan for reunification was developed for the mother. The father was in prison and did not appear at the hearing. The social worker's report noted that Crystal was a "Possible Alaskan Native," and an "Indian Heritage Questionaire" was sent to the father.

At the six-month review hearing on August 19, 1994, Crystal's dependency and current placement were continued. The mother was following the recommended activities on her service plan and had been participating in a six-month program at New Life Center. She had obtained a job and was motivated to have her child returned to her. Crystal had initially exhibited some behavioral problems after being removed from her mother's custody. However she had subsequently adjusted to living with the aunt and uncle, although she missed her mother. Unsupervised visits were ordered, starting September 1, 1994. The father was incarcerated at Pelican Bay and did not make an appearance.

On September 16, 1994, the court appointed counsel to represent the father. Counsel informed the court that the father had told her he was descended from the Haida Indian Tribe in Alaska. The court ordered the Agency to provide notice to the tribe in accordance with the Act.

At a hearing on October 28, 1994, the social worker advised the court that she had not heard from the mother and was concerned. A case plan was prepared for the father and the court ordered that a visit be arranged between Crystal and her father in prison. Meanwhile, the Agency initiated contact with the Haida Corporation in Juneau, Alaska.

On November 29, 1994, the Central Council of Tlingit and Haida Indian Tribes of Alaska (the tribe) noticed its intent to intervene in the dependency proceedings. The notice identified the father as one-half Haida. He had been recently enrolled as a tribal member as of November 10, 1994. Crystal was therefore one-fourth Haida by blood. She was not enrolled but was eligible for membership.[1]

At the 12-month review hearing on March 3, 1995, the social worker reported that the mother had relapsed to drug use. She had been rearrested and upon her release from jail, she had entered a 28-day residential program, which she had completed successfully. She renewed her commitment to pursue recovery and be reunited with her daughter. She had been visiting with Crystal once or twice monthly. Crystal had been transported to prison to visit with her father on December 2, 1994. She was four years old at the time. Aside from brief contact when she was a small baby, this was the first time Crystal had ever visited with her father. Crystal and her father visited a second time at a court appearance in January of 1995. Interaction between the two was limited.

Crystal was adjusting well to home life with the aunt and uncle. They were very interested in the dependency proceedings and had been granted standing as de facto parents. Counsel for the father reported that the father and the tribe had wanted to place Crystal with the father's sister in Salinas. However, attempts to contact the sister and initiate this placement were unsuccessful. At the conclusion of the 12-month hearing, the court ordered an additional 6 months of services. A further order provided that the father was to have monthly visits with Crystal while he was in custody.

At the 18-month review on July 21, 1995, the social worker reported that the mother was living in a clean and sober environment and had "worked hard" on completing her case plan. She was working with Families In

---

[1]Crystal was later officially enrolled as a member of the tribe on February 5, 1997.

Transition and was active in her AA/NA program and at the Parent Center. She had given birth to a baby boy in April of 1995. She had graduated successfully from a six-month perinatal program. Her visits with Crystal had been increased gradually and had been going well. Crystal was comfortable with her mother and had told the aunt and uncle that she would like to live with her mother again. Crystal had visited her father in prison two more times. Although he expressed an interest in reuniting with Crystal, he had not been able to complete his service plan while in prison.

The court recommended returning Crystal to her mother by August 18, 1995, but continuing her as a dependent child, with six months of in-home services and frequent contact and visits with the aunt and uncle. The court ordered no further physical visits with the father in prison, as these were difficult for Crystal. However, phone calls were allowed.

The case was reviewed on February 23, 1996. The social worker reported that after Crystal was returned to her mother in August of 1995, they both lived in Arriba House, a clean and sober facility. The father was released from prison in December of 1995. Soon thereafter, he moved into a home with the mother and Crystal, in violation of previous court orders. However, the father was participating in the recommended programs as well as volunteering at a local high school. The mother had been doing a "fine job" of rehabilitation, according to the social worker, and was maintaining a stable household for her family. Crystal and her little half brother appeared "well cared for and happy." The aunt and uncle maintained continued contact with Crystal. Visits were arranged through the social worker, as there were conflicts between the father and the uncle.

At the February 1996 hearing, the court found the mother and father were in contempt of previous court orders but the court did not impose sanctions, finding that both parents had made good progress towards completion of their case plans. The court continued Crystal as a dependent child and ordered six more months of in-home services.

On May 9, 1996, the mother was arrested for possession of cocaine and being under the influence of cocaine. On May 16, 1996, the father was arrested and placed on a parole hold when he tested positive for heroin. He was also found to have weapons in his car. On May 20, 1996, the Agency filed a supplemental petition under Welfare and Institutions Code section 387 containing these allegations. Crystal was again placed in protective custody and she returned to the home of the aunt and uncle.

A contested hearing on the section 387 petition, combined with the 12-month review of the in-home dependency, took place on July 19, 1996.

The social worker reported that the mother was devastated by her relapse, which she attributed to the pressures of family life. She was aware that the recommendation would be to terminate reunification services. She realized she was unable to provide adequate parenting for Crystal and she had talked with Crystal about the aunt and uncle taking care of her from now on. Crystal had renewed her strong attachment to her de facto parents and was adjusting well to their home environment. The father was again incarcerated and indicated he reserved comment until he had researched tribal law with his attorney.

The social worker recommended that the court terminate reunification services and set a Welfare and Institutions Code section 366.26 hearing. The court found "beyond a reasonable doubt" that return of Crystal to her parents' custody would create a substantial risk of detriment and it ordered reunification services terminated. A section 366.26 hearing was set for November 1, 1996. In the meantime the mother, who was living at Sunflower House, was to have supervised visits with Crystal.[2] The father was to have no visits while in prison.

After several continuances, the Welfare and Institutions Code section 366.26 hearing commenced on December 16, 1996. The Agency recommended that parental rights be terminated and that Crystal be freed for adoption. The social worker wrote that Crystal was "very attached to her prospective adoptive parents. She looks to them for comfort, security, affection and attention; she appears happy and relaxed with them." Crystal's CASA (court-appointed special advocates) worker and her therapist strongly believed adoption was in Crystal's best interests. The aunt and uncle had developed a close relationship with Crystal over the years and they very much wished to adopt her. Crystal herself, now six years old, was happy in her new home and wanted to continue living there and to be adopted by the aunt and uncle. At the start of the hearing, a dispute developed regarding the application of the heightened standards and additional requirements of the ICWA, in light of recent decisions in *Bridget R.* and *Alexandria Y.* The court therefore continued the matter and ordered all counsel to submit trial briefs.

On May 2, 1997, the court issued its decision finding that the provisions of the Act applied to this proceeding. The court acknowledged a split of authority and decided to follow those cases holding that judicial exceptions to the application of the Act were impermissible. The Welfare and Institutions Code section 366.26 hearing was rescheduled for June 30, 1997, to be conducted under the federal standards as mandated by the Act.

---

[2]The last reported visit between the mother and Crystal was on September 30, 1996. At that time they said goodbye to one another. Crystal reportedly did not show emotion on this occasion. Crystal and her new family have now relocated in another county.

On May 19, 1997, Crystal and the aunt and uncle, joined by the Agency, filed a petition for a writ of mandate in this court, asking that we direct the juvenile court to follow California law, as set forth in *Bridget R.* and *Alexandria Y.* and to apply the "existing Indian family" doctrine to remove these proceedings from the requirements of the Act. We issued an alternative writ of mandate, asked for opposition and ordered a stay of all further juvenile court proceedings. For the reasons stated below we have decided to grant the writ petition.

RELEVANT LAW UNDER THE ICWA

Studies conducted in the 1970's showed that, as a result of state foster care and adoption proceedings, large numbers of Indian children were being separated from their families and tribes and were being placed in non-Indian homes. (*Mississippi Choctaw Indian Band* v. *Holyfield* (1989) 490 U.S. 30, 32 [109 S.Ct. 1597, 1599-1600, 104 L.Ed.2d 29] (*Holyfield*).) The studies revealed that approximately 25 to 35 percent of all Indian children had been removed from their families and placed in foster care, adoptive families or institutions. Approximately 90 percent of those placements were in non-Indian homes. (*Ibid.*) Congress referred to these statistics in its congressional findings in the preamble to the Act, noting that such practices seriously diluted the continued existence and integrity of Indian tribes. (25 U.S.C. § 1901(4).)[3] In enacting the ICWA, Congress sought to " 'protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society.' " The Act established " 'a Federal policy that, where possible, an Indian child should remain in the Indian community.' " (*Holyfield*, *supra*, 490 U.S. at p. 37 [109 S.Ct. at p. 1602].)

These policies were to be implemented, in title I of the Act, by providing for tribal jurisdiction over custody proceedings involving an Indian child, for intervention by the tribe in state proceedings, and for the application of strict federal standards governing state action to remove an Indian child from its Indian family and community.

By its terms the ICWA applies wherever an Indian child is the subject of a child custody proceeding. A child custody proceeding is described as any proceeding involving foster care placement, termination of parental rights, preadoptive placement or adoptive placement. (§ 1903(1).) There are only two exceptions—delinquency proceeding placements and awards of custody to one of the parents in a divorce proceeding—neither of which applies here.

---

[3]All further statutory references are to title 25 of the United States Code unless otherwise specified.

(*Ibid.*) An Indian child is defined by the ICWA as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (§ 1903(4).)

Where the Indian child resides or is domiciled within a reservation, the Act provides that the tribe is to have exclusive jurisdiction over custody proceedings involving that child. (§ 1911(a).) Where the child is not domiciled or does not reside within the reservation, the Act creates concurrent but presumptively tribal jurisdiction. The state court must transfer jurisdiction to the child's tribe, if the tribe or either parent requests it, except upon a showing of "good cause," objection by either parent, or where the tribal court declines jurisdiction. (§ 1911(b).) In the event that jurisdiction is not transferred, section 1911(c) provides that an Indian child's tribe may intervene in any state court custody proceeding involving the child.

Sections 1912 and 1913 of the Act, respectively, set forth the federal standards for involuntary proceedings to remove Indian children from their homes, and for voluntary foster care and adoptive placements. As concerns us here, in a proceeding involving the involuntary termination of parental rights, the Act requires that the Agency prove "beyond a reasonable doubt," supported by the testimony of qualified experts, that continued custody of the child by the Indian parent or custodian "is likely to result in serious emotional or physical damage to the child." (§ 1912(f).) In addition, the court must be satisfied that active efforts have been made to provide remedial services and rehabilitative programs "designed to prevent the breakup of the Indian family." (§ 1912(d).) Furthermore, the court must follow certain placement preferences as set forth in the Act, in the absence of good cause. In adoptive placements, preference must be given to a placement with a member of the child's extended family, with other members of the Indian child's tribe, or with another Indian family. (§ 1915.)

Since many of the cases discussing the Act involve voluntary termination of parental rights, we briefly note the provisions of section 1913. Voluntary relinquishments of parental rights must be in writing. A judge must certify that the consequences were fully explained and understood. Any relinquishment executed within 10 days of the birth of the child is not valid. (§ 1913(a).) The Indian parent is entitled to withdraw consent "for any reason" at any time prior to the final order of adoption or termination, and upon such withdrawal the child must be returned to the Indian parent. (§ 1913(c).)

Finally, section 1914 provides that any Indian child, parent or tribe may petition to invalidate a voluntary or involuntary termination of parental

rights upon a showing that such action violated any of the provisions of sections 1911, 1912 or 1913.

### The "Existing Indian Family" Doctrine

This doctrine was first articulated in 1982 by the Supreme Court of Kansas in *Matter of Adoption of Baby Boy L.* (1982) 231 Kan. 199 [643 P.2d 168] (*Baby Boy L.*). In that case a non-Indian mother relinquished her illegitimate child at birth and gave her consent to his adoption by a specific adoptive family, also non-Indian. The biological father, who was incarcerated at the time of the child's birth, was five-eighths Kiowa Indian. He sought custody of the child, either for himself or for his extended Indian family. The tribe was given notice and moved to intervene in the adoption proceedings. The trial court denied the tribe's motion, finding that the Act did not apply because this was not a situation where a state agency was acting to remove a child from an existing Indian family. The court further found it was in the best interests of the child to be adopted by the family of the mother's choice, which was the only home the child had ever known. The tribe, the father and the father's parents appealed, arguing that the court was required to apply the Act because this was a custody proceeding involving an "Indian child" as defined by section 1903(1) and (4).

The Kansas Supreme Court acknowledged that the proceeding qualified under the definitions contained in the Act as a child custody proceeding involving an Indian child. The court found, however, that to apply the provisions of the Act under the circumstances would not further its important purposes and policies, namely "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families." (§ 1902.) The court found that ". . . the overriding concern of Congress and the proponents of the Act was the maintenance of the family and tribal relationships existing in Indian homes and to set minimum standards for the removal of Indian children from their existing Indian environment. It was not to dictate that an illegitimate infant who has never been a member of an Indian home or culture, and probably never would be, should be removed from its primary cultural heritage and placed in an Indian environment over the express objections of its non-Indian mother." (*Baby Boy L.*, *supra*, 643 P.2d at p. 175.)

The Kansas court examined the provisions of the Act and concluded that the underlying thread running throughout the legislation was a concern about "the removal of Indian children from an existing Indian family unit and the resultant breakup of the Indian family." (*Baby Boy L.*, *supra*, 643 P.2d at p.

175.) The Act's purpose would be violated, rather than furthered, if it were applied in circumstances where the child was only five-sixteenths Indian by blood, had never been removed from an Indian family and, so long as the mother was alive to object, would probably never become part of the father's family or any other Indian family. (*Ibid.*)

Following the lead of the Kansas court, numerous other state courts adopted the existing Indian family doctrine and refused to apply the provisions of the Act where its purpose, to prevent improper removal of Indian children from their Indian families, would not be served.[4] On the whole, these courts followed the rationale that the Act operates to protect tribal interests and preserve Indian cultural ties only when such ties can be shown to exist.

Other states rejected the doctrine, on the basis that the plain language of the Act applied to custody proceedings involving all Indian children, whether they lived in a culturally Indian environment or not.[5] According to these courts, a narrow focus only upon the interests of a particular existing family failed to recognize the broader interests of the tribe in preserving Indian culture through the concept of tribal sovereignty. To limit the application of the Act to situations where Indian children were physically removed from actual Indian dwellings would deprecate the tribal and cultural links the Act was designed to preserve.

The only United States Supreme Court case interpreting the Act did not directly address the existing Indian family doctrine. (*Holyfield, supra,* 490 U.S. 30.) *Holyfield* involved section 1911(a) of the Act, which provides for exclusive jurisdiction in tribal court where the Indian child is domiciled on the reservation. The question in *Holyfield* was whether twin children whose parents lived on the reservation, but who traveled to a distant town to give birth to the children and place them for adoption, were "domiciled" on the

---

[4]These included Alabama (*S.A.* v. *E.J.P.* (Ala. 1990) 571 So.2d 1187); Indiana (*Matter of Adoption of T.R.M.* (Ind. 1988) 525 N.E.2d 298); Kentucky (*Rye* v. *Weasel* (Ky. 1996) 934 S.W.2d 257; Louisiana (*Hampton* v. *J.A.L.* (La. Ct. App. 1995) 658 So.2d 331); Missouri (*In the Interest of S.A.M.* (Mo. 1986) 703 S.W.2d 603); Oklahoma (*Matter of S.C.* (Okla. 1992) 833 P.2d 1249); and Washington (*Matter of Adoption of Crews* (1992) 118 Wn.2d 561 [825 P.2d 305]).

[5]See decisions from Alaska (*Matter of Adoption of T.N.F.* (Alaska 1989) 781 P.2d 973); California (*In re Junious M.* (1983) 144 Cal.App.3d 786 [193 Cal.Rptr. 40] and *In re Crystal K.* (1990) 226 Cal.App.3d 655 [276 Cal.Rptr. 619]); Idaho (*Matter of Baby Boy Doe* (1993) 123 Idaho 464 [849 P.2d 925]); Michigan (*In re Elliott* (1996) 218 Mich. App. 196 [554 N.W.2d 32]); Montana (*Matter of Adoption of Riffle* (1996) 277 Mont. 388 [922 P.2d 510]); New Jersey (*Matter of Adoption of a Child of Indian Heritage* (1988) 111 N.J. 155 [543 A.2d 925]); Utah (*State, In Interest of D.A.C.* (Utah 1997) 933 P.2d 993).

reservation within the meaning of the Act. The court found that the term "domicile" must be interpreted under federal rather than state law. Under federal law the newborn children were domiciled on the reservation because both parents lived there. Although the parents had clearly gone to some effort to place the children outside of the reservation, the court found that the Act reflected concerns "going beyond the wishes of individual parents." (*Holyfield, supra,* at p. 50 [109 S.Ct. at p. 1609].) The Act sought to protect the tribe's interest in its children, an interest which was distinct from the interest of the parents. As the court explained, "Congress was concerned not solely about the interests of Indian children and families, but also about the impact on the tribes themselves of the large numbers of Indian children adopted by non-Indians." (*Holyfield, supra,* at p. 49 [109 S.Ct. at pp. 1608-1609].)

Some courts have opined that *Holyfield,* while not expressly rejecting the existing Indian family doctrine, has raised questions about the continued viability of *Baby Boy L.* and its progeny.[6] Other courts have continued to apply the doctrine, finding that *Holyfield* is limited to its facts.[7] Still other states appear to be divided on the issue.[8]

California falls into this last category. Panels from the First and Third Appellate Districts have rejected the doctrine as an impermissible judicially created exception to federal law. (*In re Junious M., supra,* 144 Cal.App.3d 786; *In re Crystal K., supra,* 226 Cal.App.3d 655; *Adoption of Lindsay C., supra,* 229 Cal.App.3d 404.) Recently, however, the Second Appellate District held that recognition of the existing Indian family doctrine was necessary under the facts of that case in order to preserve the constitutionality of the ICWA. (*Bridget R., supra,* 41 Cal.App.4th 1483.) Several months later the Fourth Appellate District followed suit in *Alexandria Y., supra,* 45 Cal.App.4th 1483.[9]

---

[6]See *Adoption of Lindsay C.* (1991) 229 Cal.App.3d 404 [280 Cal.Rptr. 194]; *Matter of Baby Boy Doe, supra,* 849 P.2d 925; *In re Elliott, supra,* 554 N.W.2d 32. See also *Matter of Adoption of Baade* (S.D. 1990) 462 N.W.2d 485, where the South Dakota Supreme Court reversed its earlier decision in *Claymore* v. *Serr* (S.D. 1987) 405 N.W.2d 650.

[7]See, e.g., *Matter of S.C., supra,* 833 P.2d 1249; *Matter of Adoption of Crews, supra,* 825 P.2d 305; *S.A.* v. *E.J.P., supra,* 571 So.2d 1187; *C.E.H.* v. *L.M.W.* (Mo.Ct.App. 1992) 837 S.W.2d 947; *Rye* v. *Weasel, supra,* 934 S.W.2d 257; *In re Morgan* (Tenn.Ct.App. 1997) 1997 WL 716880.

[8]For example, the Illinois Supreme Court recently published a decision in which three justices wrote separately, advocating recognizing the existing Indian family doctrine, three others wrote rejecting it and the lead justice decided the case on a different basis, neither accepting nor rejecting the doctrine. (*Matter of Adoption of S.S.* (1995) 167 Ill.2d 250 [212 Ill.Dec. 950, 657 N.E.2d 935].)

[9]In light of the split of authority among the appellate courts of this state, it would be extremely helpful to those practicing in this field, as well as to the families themselves, for our Supreme Court to review and resolve this issue and provide guidance for future cases.

*Bridget R.* involved twin children whose biological parents voluntarily relinquished their parental rights and placed the children for adoption through an adoption agency shortly after their birth. Although the parents had initially stated that they had no Indian heritage, the father later informed the various parties that he was of Indian descent. On this basis, the parents then sought to invoke the ICWA, invalidate their relinquishments, and have the children removed from the adoptive parents and placed within the father's extended Indian family. The trial court made orders to this effect.

The Court of Appeal reversed. The court started with the premise that children have fundamental rights and interests in family relationships which are of constitutional dimension. The state traditionally protects these interests where a parent has been found unfit, or has relinquished parental rights or otherwise has failed to establish a parent-child relationship. In a case where the interests of the tribe, which are based on the statutory rights and entitlements of the ICWA, interfere with the fundamental rights of the child to be secure in a stable and permanent home, the ICWA becomes constitutionally suspect, and must be subjected to strict scrutiny. It must be found to serve a compelling government purpose and to be actually necessary and effective to accomplish that purpose. (*Bridget R., supra,* 41 Cal.App.4th at p. 1507.)

The court in *Bridget R.* found that the ICWA met the first prong of this test. Preserving American Indian culture is undeniably a compelling interest. However as to the second prong, the court agreed with the line of cases following *Baby Boy L.,* that ". . . this purpose will not be served by applying the provisions of ICWA which are at issue in this case to children whose biological parents do not have a significant social, cultural or political relationship with an Indian community." (*Bridget R., supra,* 41 Cal.App.4th at p. 1507.) "It is almost too obvious to require articulation," the court continued, "that 'the unique values of Indian culture' [citation] will not be preserved in the homes of parents who have become fully assimilated into non-Indian culture." (*Ibid.*) Thus unless the parents could show significant social, cultural or political ties with their Indian heritage, applying the Act to remove the children from a home where they had formed familial bonds would violate the children's due process rights.

The court applied a similar analysis in concluding that the Act violated the children's equal protection rights if applied in the absence of a showing of significant ties between the Indian parents and the tribe. Without such a showing, the Act would require that Indian children be treated differently from non-Indian children in the same situation, based only on their race. (*Bridget R., supra,* 41 Cal.App.4th at p. 1508.)

Finally, the court in *Bridget R.* examined the Act in terms of the conflict between Congress's plenary power over Indian affairs and the states' traditional authority over the family relationships of its citizens. Congress exceeds its authority, the court found, when it legislates in matters generally reserved to the states in the absence of any "adequate nexus" to the enumerated power. Such a nexus could be shown by demonstrating a significant relationship between the family and the Indian tribe. Otherwise, such a family is "in all respects indistinguishable from other residents of the state," and should be governed by state law. (*Bridget R., supra,* 41 Cal.App.4th at p. 1511.)

In sum, the court concluded that the presence of significant cultural ties between the family and the Indian tribe is a necessary prerequisite to a constitutional application of the ICWA. If applied without such a showing, the Act is unconstitutional in three respects: (1) it improperly interferes with an Indian child's fundamental due process rights respecting family relationships, (2) on the sole basis of race, it deprives the child of equal opportunities and protection of the laws, and (3) it impermissibly intrudes upon a power ordinarily reserved to the states. (*Bridget R., supra,* 41 Cal.App.4th at p. 1512.) The court also disapproved of an "after the fact assertion of tribal and Indian-parent rights under ICWA." (*Ibid.*) Thus on remand the trial court was to determine whether the parents had any significant ties with tribal culture *at the time they relinquished their parental rights.* If not, then the application of the Act to remove the children from their adoptive family would be unconstitutional.

In *Alexandria Y., supra,* 45 Cal.App.4th 1483, the Fourth Appellate District followed *Bridget R.* and adopted the existing Indian family doctrine in a case which, like ours, involved a dependency proceeding. The juvenile court in *Alexandria Y.* had declined to follow ICWA placement preferences and had denied a motion to transfer jurisdiction to the tribe. The Court of Appeal affirmed, finding that the juvenile court had acted properly in refusing to apply the ICWA "because neither [the child] nor [the mother] had any significant social, cultural or political relationship with Indian life; thus, there was no existing Indian family to preserve." (*Id.* at p. 1485.)

Finally, we note that at various times since its enactment, amendments to the ICWA have been proposed in Congress by proponents of the existing Indian family doctrine as well as by those opposing the doctrine, both

without success.[10] New proposals are presently pending in both the House and Senate to amend the provisions of the Act governing adoption.[11]

### DISCUSSION

 As is apparent from the above survey, courts statewide and across the nation are sharply divided on the issue whether an existing Indian family is a prerequisite to application of the provisions of the ICWA in a child custody proceeding. Persuasive arguments have been made in support of both views. As we explain below, we have concluded, after careful study of the provisions of the Act and the substantial body of case law cited above, that the application of the existing Indian family doctrine is warranted under certain circumstances. Our analysis is based on the factual and procedural context of this case and requires that we weigh important, and often competing, interests and policy considerations. These include Crystal's interest in achieving permanency in her family life, the interests of the biological parents in maintaining the family relationship and the tribe's interest in preserving Indian culture.

We begin with the conviction that the child's best interests must be the paramount concern in custody proceedings. Nothing is more basic to a child's well-being during the formative years than a stable and loving home environment. As the court in *Bridget R.* observed, children are not merely chattels of their parents but rather have important rights and interests of their own, including the "right to be protected from neglect and to 'have a placement that is stable [and] permanent.'" (*In re Jasmon O.* (1994) 8 Cal.4th 398, 419 [33 Cal.Rptr.2d 85, 878 P.2d 1297].)

California law recognizes a stage in the dependency process where the rights of the child and the parents diverge and the child's rights are found to be more compelling. (*Cynthia D.* v. *Superior Court* (1993) 5 Cal.4th 242, 253-254 [19 Cal.Rptr.2d 698, 851 P.2d 1307].) Thus, where a child has been in out-of-home placement under the jurisdiction of the dependency court for 18 months and the parents have been provided services but have failed to correct the problems which initially caused the child to be removed from the home, the court is entitled to terminate efforts to reunite the family and focus on providing an appropriate permanent placement for the child. (*In re Jasmon O., supra,* 8 Cal.4th at p. 420; Welf. & Inst. Code, §§ 336.21, subd. (f), 366.22, subd. (a), 366.26.)

---

[10](See, e.g., H.R. No. 1448, 104th Cong., 1st Sess. (1995); Sen. No. 764, 104th Cong., 1st Sess. (1995); Sen. No. 1962, 104th Cong., 2d Sess. (1996); Sen. No. 1976, 100th Cong., 1st Sess. (1987); Title III of H.R. No. 3286, 104th Cong., 2d Sess. (1996).)

[11](Sen. No. 569, 105th Cong., 1st. Sess. (1997); H.R. No. 1082, 105th Cong., 1st Sess. (1997).)

The case before us reached that turning point over a year ago. Reunification services have been terminated and the parents have not sought review of that order. Thus it has been established in this case that the parents have not shown themselves able to make the changes necessary to provide Crystal a safe and stable home environment. Crystal's mother acknowledged that because of her continuing struggle with drug addiction, she was unable to care for Crystal. Crystal's father, whom she hardly knew and who had never provided support for her, was back in prison. At the time services were terminated, Crystal had been in out-of-home relative placement for well over the statutory 18-month period. The aunt and uncle have known her all her life. She has been living as part of their family for most of the past four years and strong attachments have formed. They want to provide a permanent home for her and she wants to be adopted by them.[12] Crystal's best interests, in the opinion of the professionals personally involved in this case, including the social worker, Crystal's therapist and the CASA worker, are to remain with her present family and be adopted by them.

Under the posture of this case, it is clear that Crystal's interests in permanently belonging to this family where she is loved and cared for take precedence over the rights of the parents, who have been unable to demonstrate their fitness as caretakers. Terminating parental rights and freeing Crystal for adoption by her present family would therefore be relatively automatic at the Welfare and Institutions Code section 366.26 hearing (see, e.g., *In re Matthew C.* (1993) 6 Cal.4th 386, 392 [24 Cal.Rptr.2d 765, 862 P.2d 765]), were it not for the additional requirements imposed by the ICWA to protect the tribe's interests.

The federal statutory scheme also reflects a shifting balance of interests. Congress identified a twofold purpose: to "protect the best interests of Indian children" as well as to "promote the stability and security of Indian tribes and families." (§ 1902.) These two goals may at times be in harmony, as are the interests of the parent and child in the early stages of dependency proceedings. However, the ICWA recognizes that the tribe's interest in child custody proceedings diminishes as the family's connections to the tribe become more attenuated. Thus the Act provides for exclusive jurisdiction if the child lives on the reservation (§ 1911(a)), concurrent jurisdiction if the parents or child no longer reside on the reservation (§ 1911(b)), and intervention by the tribe in the state court proceeding if jurisdiction is not transferred. (§ 1911(c).)

---

[12]The CASA worker wrote, in a recent report of a visit to Crystal's home, that she was "thriving" there. She was calm, comfortable and affectionate with the aunt and uncle and was very excited and involved with activities as a first grader at the local school. She calls her aunt and uncle Mom and Dad, and wanted in turn to be called Sarah B., rather than Crystal R. According to the CASA worker the child had "moved on with her life" and should be allowed to remain at home with her adoptive family.

As the tribe's interest in the proceedings weakens, the state's interest in protecting the best interests of the child assumes more importance. While providing means for the tribe to participate in the proceedings in order to ensure that the interests of the Indian family and community are preserved and protected, Congress clearly envisioned situations in which the child's best interests take precedence over the tribe's interests. (See, e.g., *Matter of Appeal in Maricopa County* (1983) 136 Ariz. 528 [667 P.2d 228, 234]; *In re Interest of C.W.* (1992) 239 Neb. 817 [479 N.W.2d 105].) For instance, the Act specifically provides that the state court can deny a request to transfer jurisdiction or can override the ICWA placement preferences based on a showing of "good cause." (§§ 1911(b), 1915.) "Good cause" often includes considerations affecting the best interests of the child, such as whether the child has had any significant contact with the tribe, the detriment to the child from removal to a tribal court, or the extent of the child's bonding with a prospective adoptive family. (See, e.g., *C.E.H.* v. *L.M.W.*, *supra*, 837 S.W.2d 947; *Matter of Adoption of T.R.M.*, *supra*, 525 N.E.2d 298; *In re Interest of C.W.*, *supra*, 479 N.W.2d 105; *In re Robert T.* (1988) 200 Cal.App.3d 657 [246 Cal.Rptr. 168]; *In re Baby Girl A.* (1991) 230 Cal.App.3d 1611, 1620 [282 Cal.Rptr. 105]; *Adoption of M.* (1992) 66 Wn.App.475 [832 P.2d 518].)[13]

Where the state court proceeding has reached the point at which reunification has failed and the child's interests in permanent placement outweigh the interests of the parents, we believe it is appropriate for the court to examine the strength of the tribe's interests in protecting Indian cultural ties. If the evidence shows that such ties have become so attenuated as to be virtually nonexistent, it makes little sense to bring the requirements of the ICWA to bear on the proceedings. Not only does the application of the ICWA in such circumstances work against the best interests of the child, who is poised to move forward with his or her life as part of a stable family unit, it does nothing to further the purpose of preserving " 'the unique values of Indian culture.' " (*In re Bridget R.*, *supra*, 41 Cal.App.4th at p. 1507.)

It is often the case, as it is here, that the parent who seeks to invoke the protections of the Act has had no significant relationship *either with the tribe or with the child.* Crystal is seven years old and has had no meaningful contact with her father, with the exception of a five-month period just prior to his most recent arrest and reincarceration. The father was not born in Alaska, where this tribe is located, has never lived there, and has indicated

---

[13]But see also *Matter of Adoption of Riffle*, *supra*, 922 P.2d 510; *Yavapai-Apache Tribe* v. *Mejia* (Tex.App. 1995) 906 S.W.2d 152, 169; *Matter of Custody of S.E.G.* (Minn. 1994) 521 N.W.2d 357, 362-363, holding that "good cause" under the Act does not include the best interests of the child.

no intention of returning there. Although Crystal may be the "biological child of a tribal member" (§ 1903(4)), the father was not an enrolled member when she was born. His interest in his Indian heritage is a recent phenomenon, sparked, as it would appear, by the commencement of the dependency and the notice provided by the Agency. Prior to that time the father was seemingly not part of any "Indian community" and in all likelihood never would have been in the absence of these proceedings.

■ As the court in *Bridget R.* observed, ". . . more is required to justify an application of ICWA than a biological parent's mere formal enrollment in a tribe, or a self-serving after-the-fact tribal recognition of such a parent's membership. Such token attestations of cultural identity fall short of establishing the existence of those *significant* cultural traditions and affiliations which ICWA exists to preserve . . . ." (*Bridget R.*, *supra*, 41 Cal.App.4th at p. 1512, italics in original.) We do not believe Congress could have intended that the special protections provided by the ICWA be invoked as a legal ploy in a custody proceeding by a parent who has otherwise abdicated parental rights and has no demonstrable ties to Indian culture. We find no compelling reason why such a parent should be entitled to rights and protections greater than any other resident of the state.

■ The existing Indian family doctrine has the imprimatur of the high courts of many other states.[14] As these courts have found, the doctrine is supported both by language in the Act itself and by the legislative history behind it. Legislators were concerned about statistics showing that state agencies, who had "no basis for intelligently evaluating the cultural and social premises underlying Indian home life and childrearing," were acting

---

[14]See *Matter of Adoption of T.R.M.*, *supra*, 525 N.E.2d at page 303 ("The Act is applicable when you have Indian children being removed from their existing Indian environment."); *Baby Boy L.*, *supra*, 643 P.2d at page 175 (". . . the Act is concerned with the removal of Indian children from an existing Indian family unit and the resultant breakup of the Indian family."); *Matter of S.C.*, *supra*, 833 P.2d at page 1255 (Although the child may be an "Indian child" based on the tribe's constitution, "we do not find an existing Indian family unit or environment from which [the child] was removed or to which he would be returned. To apply ICWA in this specific situation would not further the policies and purposes of ICWA."); *Matter of Adoption of Crews*, *supra*, 825 P.2d at pages 310-311 ("ICWA is not applicable when an Indian child is not being removed from an Indian cultural setting, the natural parents have no substantive ties to a specific tribe, and neither the parents nor their families have resided or plan to reside within a tribal reservation. In such a situation, whether or when a child meets the definition of 'Indian child' under ICWA is not controlling."); see also *S.A.* v. *E.J.P.*, *supra*, 571 So.2d at page 1190 ("To apply the ICWA to the facts of this case would be contrary to the congressional intent."); *C.E.H.* v. *L.M.W.*, *supra*, 837 S.W.2d at page 952 (". . . the Act is not applicable where an Indian child is not being removed from an Indian cultural setting . . . ."); *Rye* v. *Weasel*, *supra*, 934 S.W.2d at pages 261-263.

to remove Indian children from their families and tribes.[15] Congress sought to provide special protection for such families and to preserve the cultural values underlying Indian home life. Preservation of the Indian family was thus "an integral purpose of the ICWA from its inception." (*Matter of S.C.*, *supra*, 833 P.2d at p. 1256.) Consistent with this purpose, the language of the Act repeatedly refers to the preservation of the Indian family, the breakup of the Indian family, and the removal of Indian children from their Indian parents or custodians. (See, e.g., §§ 1901(4), 1902, 1912(d), 1914, 1916(b), 1920, 1922.) It "was never intended to apply where the preservation of an 'Indian family or environment' was not at stake." (*Hampton* v. *J.A.L.*, *supra*, 658 So.2d 331, 334; *Matter of Adoption of Crews*, *supra*, 825 P.2d at p. 310.)

Contrary to the parents' assertions that the existing Indian family doctrine undermines the purposes and remedial effects of the Act, we believe that requiring an existing Indian family as a condition of applying the Act promotes the specific goals Congress sought to achieve. It ensures that a child's ties with his or her Indian parents and with the tribe are protected and preserved *where such ties exist.* (See, e.g., *Hampton* v. *J.A.L.*, *supra*, 658 So.2d 331, 335.) In the absence of such ties, the doctrine ensures that the invocation of the Act's protections will not be abused and that state law will operate to protect the best interests of the child.

We do not believe the Supreme Court's decision in *Holyfield* abrogates the existing Indian family exception. *Holyfield* was concerned with the interpretation of the jurisdictional provisions of section 1911(a), and specifically with the term "domicile" as used in the Act. The court did not mention the existing Indian family doctrine and did not address the issue whether the Act should apply in the absence of such a family because both parents in *Holyfield* resided on the reservation and clearly had significant ties to tribal culture. The purpose of the Act was to prevent the removal of Indian children in precisely such a situation. *Holyfield* in no way negates the conclusion that the Act is not applicable where an Indian child is not being removed from an Indian cultural setting, where the natural parents have no ties to a specific tribe, and where neither the parents nor their extended families have resided or plan to reside within a tribal reservation. (*C.E.H.* v. *L.M.W.*, *supra*, 837 S.W.2d 947, 952; *Matter of Adoption of Crews*, *supra*, 825 P.2d at p. 310.) Finally, as we have noted, other courts, including most recently the two California courts in *Bridget R.* and *Alexandria Y.*, have

---

[15]Hearings before the Subcommittee on Indian Affairs and Public Lands of the House Committee on Interior and Insular Affairs on Senate Bill No. 1214, 95th Cong., 2d Sess., at pages 191-192 (1978).

continued to apply the existing Indian family doctrine post-*Holyfield*.[16] The Supreme Court has denied certiorari in *Bridget R. sub nom. (Dry Creek Rancheria* v. *Bridget R.* (1997) __ U.S. __ [117 S.Ct. 1460, 137 L.Ed.2d 564].)

The parents contend that the federal guidelines (25 C.F.R. § 23.2 (1997)) and the recently amended California Rules of Court, rules 1410, 1412, and 1439 constitute a rejection of the existing Indian family doctrine because neither the guidelines nor the California Rules of Court refer to the doctrine. We are not persuaded by this argument. The failure to expressly include language adopting the doctrine is not evidence of any intention to reject it. The parents argue that rule 1439(f)(1) of the California Rules of Court amounts to a repudiation of the doctrine. That rule provides that "a tribe's determination that the child is or is not a member of or eligible for membership in the tribe is conclusive." As the case law makes clear, however, the existing Indian family doctrine applies to remove the proceedings from the scope of the Act even if the child is determined to be an Indian child under the tribe's constitution. (See, e.g., *Matter of Adoption of Crews, supra,* 825 P.2d 305, 308 [the Act was not intended to apply in certain situations "[r]egardless of [the baby's] tribal membership or lack thereof"].) The remainder of the amendments to the rules of court enforce the procedural requirements of the ICWA and apply only if the Act applies.

We now join the Second and Fourth District Courts of Appeal in adopting the existing Indian family doctrine. We believe the Act was intended to preserve Indian culture by protecting Indian families and communities from unwarranted state interference. It follows that if the family has no significant ties with an Indian tribe or community, sufficient to distinguish it from any other family subject to a state court custody proceeding, the Act does not serve the purposes for which it was enacted, and its provisions should not be enforced.

The courts in *Bridget R.* and *Alexandria Y.* have differed regarding the scope of the existing Indian family doctrine. *Bridget R.* would limit its application to cases where neither the parents nor the child have significant ties with tribal culture. *Alexandria Y.* advocates a more expansive application of the doctrine "dependent on the unique facts of each situation." (*Alexandria Y., supra,* 45 Cal.App.4th at p. 1493.) We are inclined to the view expressed in *Bridget R.*, which we believe is more in keeping with the purposes of the ICWA.

Finally, we note that while most courts adopting the existing Indian family doctrine have applied it in the context of voluntary adoption proceedings initiated by one or both parents, we believe it is equally appropriate in

[16]See footnote 7, *ante.*

dependency proceedings, particularly where services have been provided, and have been unsuccessful, and it appears the family will not be reunited. Although the application of the provisions of the Act in a dependency proceeding, unlike the voluntary adoption cases, may not result in the child being immediately removed from his or her home and placed with strangers in a foreign culture, it nonetheless necessarily results in delay, expense and uncertainty for all parties. Severing the psychological bond with de facto parents who have become the child's family unit obviously has devastating consequences to the best interests of the child. Almost as detrimental is the constant spectre of the possibility of such a consequence. A child deserves to have a "stable and permanent home[] in which [his or her] mind and character can grow, unhampered by uncertainty and fear of what the next day or week or court appearance may bring." (*Bridget R.*, *supra*, 41 Cal.App.4th at p. 1504; *In re Jasmon O.*, *supra*, 8 Cal.4th at p. 419.)

## CONCLUSION

 The time is long past for Crystal to have the certainty about her future to which she is entitled. She is seven years old and does not yet belong to a permanent family unit. Despite the provision of services during the reunification period, her biological parents have failed to demonstrate their ability to provide adequate parenting. The Indian father barely knows his daughter and has only recently established contact with his tribe. The only stable home Crystal has experienced for any significant period of time has been with her mother's aunt and uncle. Under these circumstances we conclude that unless the father in this case can establish that he has maintained significant social, cultural or political ties with the tribe from which he is descended, the Act does not apply to this family.

We will therefore grant the writ petition and direct that the trial court conduct a hearing, as described in *Bridget R.*, in order to determine whether such ties exist. The father and the tribe have the burden of proof at this hearing to establish significant ties by a preponderance of the evidence. In the event they are unable to carry this burden, the requirements of the ICWA do not apply to this case and the court is to proceed as soon as possible with the selection and implementation hearing under Welfare and Institutions Code section 366.26.

Cottle, P. J., and Premo, J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied February 18, 1998.