[No. H030258. Sixth Dist. May 17, 2007.]

In re VINCENT M., a Person Coming Under the Juvenile Court Law.
SANTA CRUZ COUNTY HUMAN RESOURCES AGENCY, Plaintiff and
Respondent, v.
PAZ M., et al., Defendants and Appellants.

COUNSEL

Carol Koenig, under appointment by the Court of Appeal, for Defendant and Appellant Paz M.

Janet G. Sherwood, under appointment by the Court of Appeal, for Defendant and Appellant Vincent M., Sr.

Dana McRae, County Counsel, Jane M. Scott and Shannon Sullivan, Assistant County Counsel, for Plaintiff and Respondent.

OPINION

**MIHARA, J.**—Appellants Paz M. (mother) and Vincent M., Sr. (father), are the parents of Vincent M., Jr. (Vincent). Two-year-old Vincent was detained in July 2004. At that time, he was living with mother in a residential substance abuse treatment program in which she was participating. Father was in prison, where he had been throughout Vincent's life. Mother immediately notified the Santa Cruz County Human Resources Agency (the Agency) of her Sioux and Chippewa Indian heritage and provided her tribal enrollment number. The juvenile court took jurisdiction over Vincent, removed Vincent from mother's custody, denied mother reunification services based on her prior failures to reunify with her seven other children, and granted father reunification services.

Both parents appealed from the dispositional order and, among other things, attacked the adequacy of the Agency's compliance with the notice

provisions of the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA). This court reversed the juvenile court's order solely due to lack of compliance with the ICWA's notice requirements and remanded for compliance with those requirements. After remittitur, with a Welfare and Institutions Code section[1] 366.26 hearing pending, new notices were sent, and no tribe indicated that Vincent was a member or eligible for membership. Subsequently, in advance of the section 366.26 hearing, the Turtle Mountain Band of Chippewa Indians (Turtle Mountain Chippewa) and the Bureau of Indian Affairs (BIA) certified that Vincent was a member of the Turtle Mountain Chippewa tribe. The tribe sought a transfer of jurisdiction to its tribal court, and it sought to intervene in the juvenile court proceedings. The juvenile court, utilizing the "existing Indian family doctrine," found that the ICWA did not apply. Without applying the substantive provisions of the ICWA, the court terminated parental rights and selected a permanent plan of adoption.

The parents again appeal. They claim that the juvenile court erred in utilizing the "existing Indian family" doctrine to support its conclusion that the substantive provisions of the ICWA did not apply here. We conclude that the "existing Indian family" doctrine is not valid, and that the juvenile court erred in utilizing it to support its conclusion that the ICWA did not apply to Vincent. We reverse and remand for further proceedings in compliance with the ICWA's substantive requirements.

## I. Background

Mother is a longtime heroin addict. Before Vincent's birth, mother had given birth to four drug-addicted children. These children, and her other children, had been removed from her custody, and she had failed to reunify with them. In 2000 and 2001, mother participated in an Indian substance abuse treatment program in San Francisco. In June 2002, when she was six months pregnant with Vincent, she was arrested in Watsonville for being under the influence of heroin. She admitted that she had used heroin that day. Father was in state prison continuously from 1991 to 2004. Vincent was apparently conceived during a conjugal visit.

Vincent was born in September 2002 in Wyoming. On June 5, 2004, mother was pushing Vincent in his stroller in a busy area of Santa Cruz when she was detained by a police officer for possession of an open container of alcohol. Heroin was found in her pocket, and she admitted that she had used heroin earlier that day and was feeling its effects. Mother asserted that she had recently relapsed after being "clean and sober for three years." Mother's

---

[1] Subsequent statutory references are to the Welfare and Institutions Code unless otherwise specified.

local relative took Vincent to stay with her while mother was in custody, and mother entered a residential substance abuse treatment program after her release from custody. Vincent resided with mother during this program, and she appeared to be attentive to him and responsive to his needs. On July 22, 2004, about a month after mother entered the program, Vincent was detained by the Agency. Mother immediately notified the Agency that she was an enrolled member of an Indian tribe and provided her enrollment number. She identified her Indian heritage as Sioux and Chippewa.

On July 26, 2004, the Agency filed a petition alleging that Vincent came within the jurisdiction of the juvenile court under section 300, subdivisions (b) and (j). The Agency sent out inadequate ICWA notices addressed to the Spirit Lake Sioux tribe, the Turtle Mountain Chippewa tribe and the BIA. Vincent was placed in a foster/adoptive home in August 2004. In August 2004, the Turtle Mountain Chippewa tribe in North Dakota notified the Agency that Vincent was neither enrolled nor eligible for enrollment.

At the October 5, 2004 jurisdictional/dispositional hearing, the court found the allegations of the petition true, took jurisdiction, and removed Vincent from mother's custody. Father, who was still in prison but due to be released very shortly, was granted reunification services, but mother was denied services due to her failure to reunify with her other children and her failure to make reasonable efforts to treat the substance abuse problem that had led to her prior failures to reunify. Mother testified at the hearing that she had lived with her paternal grandfather on a North Dakota Indian reservation in 2001 and 2002. The court found that the ICWA did not apply, and Vincent was placed in foster care. Both mother and father appealed to this court from the juvenile court's dispositional order.

In March 2005, while the parents' appeal was pending, the Agency recommended that the court terminate father's reunification services and schedule a section 366.26 hearing. Father had failed to make significant progress on his case plan. At the March 2005 six-month review hearing, the court found that the ICWA did not apply and terminated reunification services. It set a section 366.26 hearing for July 22, 2005. The hearing was subsequently continued at the Agency's behest due to the pendency of the appeal. By this point, father was incarcerated in Oregon.

In September 2005, this court filed its opinion in the parents' appeal. This court rejected most of their contentions challenging the jurisdictional and dispositional orders, but it found meritorious their contentions that the juvenile court had erred in implicitly finding that the ICWA notices were adequate. This court reversed and remanded for compliance with the ICWA's notice provisions. Pending finality of this court's decision, the section 366.26

hearing was rescheduled for January 2006. The Agency was recommending termination of parental rights and a permanent plan of adoption.

On November 17, 2005, the Agency sent notices to numerous Indian tribes and the BIA of the scheduled January 2006 hearing. The tribes included the Spirit Lake Sioux (Spirit Lake) tribe in North Dakota and the Turtle Mountain Chippewa tribe in North Dakota. These notices provided mother's Spirit Lake tribal enrollment number and stated that mother had been treated at an Indian substance abuse clinic in 2003. The notices contained some misinformation. Mother's Turtle Mountain Chippewa maternal great-grandmother was identified as "Mabel Ironbear Smith Bruns" instead of "Mabel Ironbear Smith Burns." The notices stated that mother had lived "on reservation in Arizona during pregnency [*sic*]" in "2001 & 2002" and "1993," when she had actually lived on Wyoming and North Dakota reservations.

In November 2005, Frank Myrick, the Spirit Lake tribe's ICWA director, contacted the Agency by telephone and stated that mother and Vincent were both eligible for membership. Because the Spirit Lake tribe had previously stated that Vincent was not eligible for membership, the Agency requested written confirmation. Written confirmation was not forthcoming.

Vincent's foster parents, with whom Vincent had been living continuously since August 2004, were granted de facto parent status in December 2005. This court's decision in the parents' appeal became final in late December 2005.

On January 13, 2006, the juvenile court held a hearing at which it declined to make ICWA findings due to the Spirit Lake tribe's inconsistent responses. The court continued the matter for clarification of Vincent's status. On January 27, 2006, the Agency filed an "ICWA UPDATE." The Agency reported that it had received two more telephone calls from Myrick inquiring as to why he had not yet received anything from the Agency. When Myrick was told that the Agency needed confirmation in writing of Vincent's status, Myrick complained about the Agency "putting up so many 'roadblocks' for this case . . . ."

At a January 27, 2006 hearing, the court found that the ICWA did not apply. The section 366.26 hearing was rescheduled for February 17, 2006. On February 15, 2006, mother's attorney filed a copy of a letter from the Spirit Lake tribe stating that mother was a member of the tribe and Vincent was "a descendant of the Spirit Lake Sioux Tribe" but "not a member" of the tribe. The section 366.26 hearing was subsequently rescheduled for March 16, 2006.

The social worker's report for the section 366.26 hearing stated that the ICWA "may apply." Mother's uncle, who lived on the Spirit Lake reservation

in North Dakota, had requested that he be considered as a placement for Vincent, and the social worker had requested an ICPC[2] assessment of the uncle. The social worker expressed the belief that "it would definitely not be in this child's interests to be moved from the placement with the prospective adoptive parents because he is clearly bonded to them and has been thriving in their care for nearly half of his life." The social worker reported that mother had recently been arrested on narcotics charges.

On March 15, 2006, the BIA certified in writing that Vincent was a member of the Turtle Mountain Chippewa tribe. That same day, mother's attorney filed four documents on behalf of the Turtle Mountain Chippewa tribe. One document was an "ORDER ACCEPTING JURISDICTION." This document, which was signed by a Turtle Mountain Chippewa Tribal Court judge, stated that the Turtle Mountain Chippewa Tribal Court accepted jurisdiction over Vincent on March 15, 2006. The second document was a motion by the Turtle Mountain Chippewa tribe seeking to intervene in the juvenile court proceedings. The third document was a motion seeking a transfer of jurisdiction to the tribal court and dismissal of the state court proceedings. The fourth document was a "NOTICE OF INTERVENTION" seeking copies of the state court documents and asking for notice of all hearings. The Agency filed opposition to these requests.

At the scheduled March 16, 2006 hearing, the Agency conceded that Vincent was a member of the Turtle Mountain Chippewa tribe, but it argued that the court should still find that the ICWA did not apply by applying the "existing Indian Family Doctrine." The Agency asked the court to order briefing on the issue of whether the ICWA applied. The court continued the section 366.26 hearing, requested briefing on this issue, and scheduled a hearing for April 7, 2006, on the Turtle Mountain Chippewa tribe's motions. The court said: "[H]ere's this document that says [Vincent is a member of the tribe]—seems like a great appellate issue. However, then you have Crystal R.[3], so it's a really interesting case." The Agency's attorney admitted that the Agency was to blame for the delay in the section 366.26 hearing "because of inappropriate or incomplete notice at the beginning of this case."

On April 7, 2006, Tara Smith filed an application to intervene in the proceedings. Smith was a member of the Spirit Lake tribe and mother's first cousin, and she was also eligible for enrollment in the Turtle Mountain Chippewa tribe because she had "mixed blood." Smith's paternal grandmother, Mabel Ironbear, who was also mother's paternal grandmother, was a

---

[2] ICPC is the Interstate Compact on Placement of Children. (Fam. Code, § 7900 et seq.) An ICPC assessment is used to assess the viability of an out-of-state placement.

[3] *Crystal R. v. Superior Court* (1997) 59 Cal.App.4th 703 [69 Cal.Rptr.2d 414] was a Sixth District Court of Appeal decision in which a panel of this court accepted the existing Indian family doctrine and applied it in a Santa Cruz County case.

member of the Turtle Mountain Chippewa tribe. Smith sought to provide Vincent with a home on the Spirit Lake reservation in North Dakota, where she resided. Mother's trial counsel asserted that Smith's intervention was dependent on the application of the ICWA.

Smith testified very briefly at the April 7, 2006 hearing.[4] Shortly after Smith began to testify, the court interrupted her testimony because it had to take a verdict in another case. The hearing was continued to May 5, 2006. Mother's trial counsel noted that she expected the Turtle Mountain Chippewa tribe's social worker to testify at the continued hearing and asked if she could testify by telephone. No decision was made on whether telephonic testimony would be permitted.

On May 4, 2006, mother's attorney informed the court and the Agency that the Turtle Mountain Chippewa tribe "is now represented by counsel, Bernice Delorme." On May 5, 2006, the court informed the attorneys that it was unavailable and that the hearing would have to be rescheduled. Mother's counsel indicated that Smith would be available to testify in June. The hearing was continued to June 7, 2006, and the court directed the Agency to provide notice of the continued hearing date to the Turtle Mountain Chippewa tribe. On May 11, 2006, the Agency sent notice of the June 7, 2006 section 366.26 hearing to the Turtle Mountain Chippewa tribe in North Dakota.

On June 7, 2006, mother's attorney filed a request for a continuance to permit Smith to testify at the hearing. Her request stated that Smith would be available to testify after July 17, 2006. At the June 7 hearing, mother's attorney stated that Smith could not afford transportation to the hearing, but mother's attorney had arranged for her law firm to pay the cost of transportation if the matter was continued. Mother's counsel admitted that she had known of Smith's unavailability since May 5. The Agency and Vincent's attorney opposed any continuance. The court denied the continuance request and struck Smith's earlier testimony.

The first issue addressed by the court at the June 7 hearing was whether the ICWA applied. The Agency presented no evidence on this issue. The Agency conceded that Vincent was "one-quarter Indian": "1/8 Sioux and 1/8 Chippewa." It also conceded that the Spirit Lake Sioux tribe's membership requirements mandated "a quarter Sioux" while the Turtle Mountain Chippewa tribe's membership requirements mandated only a total of "one-quarter Indian" so long as there was some Chippewa ancestry. The Agency

---

[4] Smith had been present at Vincent's birth, and she testified that Vincent had been given an Indian name at the age of three weeks.

further conceded that "Mother does have connections to Indian culture, but it's not the Chippewa, it's Sioux." Mother testified that she and father were currently living on the Spirit Lake Sioux reservation in North Dakota.

Mother testified at the hearing.[5] Mother lived on the Spirit Lake Sioux reservation in 1998, 2001 and 2002. Mother was a member of the Spirit Lake Sioux tribe, and Vincent was a member of the Turtle Mountain Chippewa tribe. The Spirit Lake Sioux and the Turtle Mountain Chippewa are "neighboring tribes" in North Dakota, and historically their children attended the same schools. There has been a lot of intermarriage between the two tribes, and many Spirit Lake Sioux live on the Turtle Mountain Chippewa reservation. Mother's grandfather was "full-blooded" Spirit Lake Sioux and was born on the Spirit Lake Sioux reservation. Her grandmother was "full-blooded" Turtle Mountain Chippewa. Mother's cousins' children are members of the Turtle Mountain Chippewa tribe, while their parents and grandparents are members of the Spirit Lake Sioux tribe. One of mother's aunts and a number of her cousins live on the Turtle Mountain Chippewa reservation.

Mother has visited the Turtle Mountain Chippewa reservation and participated in a number of ceremonies there, including "[p]ow-wows," "sweats," "women gatherings, [and] the gatherings for the children, [and] the elders." Some Turtle Mountain Chippewa members live on the Spirit Lake reservation, and they have the opportunity to participate in Turtle Mountain Chippewa events "because gatherings and our ceremonies are done together," and they "go back and forth" to observe "the traditions of our tribes and family events."

Mother explained that, at the time of Vincent's birth, she had been living on the Wind River Arapahoe reservation in Wyoming with her Sioux and Chippewa cousins Alba and Silvia, who are married to Arapahoe men, and her uncle David. Vincent was given both an Indian birth name and an Indian "character name." His Indian "character name" is "Wicasha Hoksina," and his Indian "birth name" is "Smiley," which was the name of mother's Indian great-grandfather. David, who is a Sioux and Chippewa "elder" and a "spiritual advisor for the tribe," took Vincent to a special Indian ceremony when Vincent was one week old, and Vincent returned with a medicine pouch, moccasins, a "longtail roach" made of porcupine quills, and a buffalo robe. Because mother's father was dead, David served as Vincent's grandfather, and he taught Vincent his "first language," "the dialect of Lakota," which is the language of the Sioux.

---

[5] Mother testified that she hoped that Vincent could be placed with her great-aunt, Delvita Abraham, who lived on the Spirit Lake Sioux reservation and was a member of the Spirit Lake Sioux tribe.

Mother and Vincent lived on the Wind River reservation until they came to California in June 2004. Mother and Vincent participated in traditional Lakota Sioux ceremonies when they lived on the Wind River reservation. Because mother comes from "a line of chiefs and spiritual advisors which are medicine men," Vincent was "considered to be a gifted child among my tribe."

The Agency argued that the court should apply the existing Indian family doctrine and find that the ICWA did not apply. It contended that mother and Vincent had a relationship with the Spirit Lake Sioux tribe but not with the Turtle Mountain Chippewa tribe, and therefore there was no existing *Chippewa* Indian family. The Agency and Vincent's attorney asserted that the court was required to apply a balancing test under which it weighed the interest of the Turtle Mountain Chippewa tribe against Vincent's interest in maintaining his stable placement.

Vincent's attorney submitted her own March 30, 2006 declaration recounting a March 20 telephone conversation she had had with the Turtle Mountain Chippewa tribe's ICWA coordinator, Marilyn Poitra. Poitra had told Vincent's attorney that the delay in identifying Vincent as a member of the Turtle Mountain Chippewa tribe was due to the fact that the tribe had only recently been able to confirm mother's Turtle Mountain Chippewa ancestry. Poitra said that the tribe "would have to figure out some of the details" later, but it planned to "place Vincent with his great uncle on the Spirit Lake reservation" as "a courtesy they did the Spirit [L]ake tribe." Vincent's attorney argued that Poitra's statements demonstrated that Vincent would have no connection to the Turtle Mountain Chippewa tribe other than his blood relationship and his membership.

Mother and father argued that the existing Indian family doctrine was a violation of the ICWA and Welfare and Institutions Code section 360.6,[6] and that Vincent *was* part of an existing Indian family.

The juvenile court found that the ICWA did not apply. "The facts of this case demonstrate why we have the existing Indian Family Doctrine, that it's not black and white. This is a perfect example as to why the Court has to do more than simply look at a declaration from the Tribe of someone's membership. [¶] Turtle Mountain had ample opportunity to come forward and declare that Vincent was a member of their tribe. [¶] Spirit Lake had ample opportunity as well and chose not to. Turtle Mountain came in belatedly, for reasons that are quite suspect by this Court. I wasn't there. But listening to the evidence and the declaration, it's suspect. [¶] Vincent has no connection

---

[6] See footnote 8, *post.*

to Turtle Mountain that's found by this Court. His mother has certainly connection to Spirit Lake. She's a member there. But the Court finds that the relationship between Vincent and Turtle Mountain is inadequate to meet the Constitutional requirements. [¶] Vincent's interests versus the tribe's interest weigh heavily on the side of Vincent's need for stability. He's been in fost-adopt placement for the last two years, over half of his life, and yanking him out of that placement would be devastating for that young man. [¶] The interest of Turtle Mountain isn't close. [¶] The answer to [*sic*] Turtle Mountain contributed to this situation where he has been in a stable placement for this long period of time. [¶] To allow Turtle Mountain's declaration to be the end of the inquiry here would be to abandon Vincent's Constitutional Rights; furthermore, more importantly, it would be to totally disregard his best interests."

The court then proceeded with the section 366.26 hearing. It denied Smith's intervention petition, terminated parental rights, and selected a permanent plan of adoption. Mother and father filed timely notices of appeal.

## II. Discussion

### A. The ICWA

When it enacted the ICWA nearly three decades ago, Congress made a number of findings, which it codified. "[T]here is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and . . . the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe; [¶] . . . [A]n alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and . . . an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions . . . . [¶] . . . [T]he States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." (25 U.S.C. § 1901(3), (4), (5).) "[I]t is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs." (25 U.S.C. § 1902.)

■ The ICWA defines "Indian" to include "any person who is a member of an Indian tribe" and provides that an "Indian child" is "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."[7] (25 U.S.C. § 1903(3), (4).) "Indian child's tribe" is "the Indian tribe in which an Indian child is a member or eligible for membership." (25 U.S.C. § 1903(5).)

■ The ICWA's substantive provisions favor the transfer of jurisdiction to the tribal court upon request and mandate allowance of intervention by the tribe in state juvenile proceedings. "In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, *shall transfer such proceeding to the jurisdiction of the tribe*, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe: *Provided*, That such transfer shall be subject to declination by the tribal court of such tribe." (25 U.S.C. § 1911(b), first italics added, second italics original.) "In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and *the Indian child's tribe shall have a right to intervene at any point in the proceeding*." (25 U.S.C. § 1911(c), italics added.)

Tribal court orders must be given full faith and credit. "The United States, every State, every territory or possession of the United States, and every Indian tribe shall give full faith and credit to the public acts, records, and judicial proceedings of any Indian tribe applicable to Indian child custody proceedings to the same extent that such entities give full faith and credit to the public acts, records, and judicial proceedings of any other entity." (25 U.S.C. § 1911(d).)

■ When termination of parental rights is sought and the ICWA applies, specific evidentiary requirements must be met. "No termination of parental rights may be ordered in such proceeding [involving an Indian child] in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (25 U.S.C. § 1912(f).)

In this case, it is undisputed that Vincent is an Indian child, since both the Turtle Mountain Chippewa tribe and the BIA have certified that Vincent is a

---

[7] The ICWA also defines "Indian tribe" to limit it to federally recognized Indian tribes. (25 U.S.C. § 1903.)

member of the Turtle Mountain Chippewa tribe. Thus, it would appear to be a straightforward proposition that the ICWA applies. However, the juvenile court found that the ICWA was inapplicable, and the court did not comply with any of the ICWA's substantive provisions. The juvenile court did not consider transferring jurisdiction to the tribal court, did not credit the tribal court's order taking jurisdiction over Vincent, and did not consider allowing the tribe to intervene in the juvenile court proceedings. The juvenile court also did not apply the ICWA's strict evidentiary requirements at the section 366.26 hearing.

The juvenile court premised its refusal to apply the ICWA's substantive requirements on a controversial judicially created exception to the ICWA that has become known as the "existing Indian family doctrine." We turn to an examination of the validity of this doctrine.

## B. The Existing Indian Family Doctrine: From 1982 to 1999

The existing Indian family doctrine is generally believed to have originated in a 1982 decision of the Kansas Supreme Court. That court, relying on its interpretation of Congress's intent in adopting the ICWA, held that the ICWA was inapplicable if the child was not removed from an existing Indian "environment." (*In re Suzanna L.* (2002) 104 Cal.App.4th 223, 233 [127 Cal.Rptr.2d 860]; *Adoption of Lindsay C.* (1991) 229 Cal.App.3d 404, 409–410 [280 Cal.Rptr. 194] (*Lindsay*).) Since 1982, some state courts have adopted the Kansas court's position on this issue, while others have rejected it. (*Lindsay*, at pp. 410–411, 413.) California Courts of Appeal have split on the issue.

In *Mississippi Choctaw Indian Band v. Holyfield* (1989) 490 U.S. 30 [104 L.Ed.2d 29, 109 S.Ct. 1597] (*Holyfield*), the United States Supreme Court construed the meaning of the provisions of the ICWA that grant a tribal court exclusive jurisdiction over proceedings involving the custody of Indian children domiciled on the reservation. The children had been born at a distant hospital that was not on the reservation to tribe member parents who lived on the reservation. The parents immediately surrendered the children for adoption by a non-Indian family. (*Holyfield*, at pp. 32, 37, 42.) The tribe sought to invalidate the adoption decree on the ground that its tribal court had exclusive jurisdiction under the ICWA because the children were domiciled on the reservation. (*Holyfield*, at p. 38.)

The United States Supreme Court framed the issue as whether Congress had intended for "domicile" to be determined by federal law or state law. (*Holyfield, supra,* 490 U.S. at p. 43.) The court found that Congress had not

intended to rely on state law. "Indeed, the congressional findings that are a part of the statute demonstrate that Congress perceived the States and their courts as partly responsible for the problem it intended to correct." (*Holyfield*, at p. 45.) "[The] main effect of [the ICWA] is to curtail state authority." (*Holyfield*, at p. 45, fn. 17.) The court concluded that the children were domiciled on the reservation. "Tribal jurisdiction under § 1911(a) was not meant to be defeated by the actions of individual members of the tribe, for Congress was concerned not solely about the interests of Indian children and families, but also about the impact on the tribes themselves of the large numbers of Indian children adopted by non-Indians. [Citations.] The numerous prerogatives accorded the tribes through the ICWA's substantive provisions, e.g., §§ 1911(a) (exclusive jurisdiction over reservation domiciliaries), 1911(b) (presumptive jurisdiction over nondomiciliaries), 1911(c) (right of intervention), 1912(a) (notice), 1914 (right to petition for invalidation of state-court action), 1915(c) (right to alter presumptive placement priorities applicable to state-court actions), 1915(e) (right to obtain records), 1919 (authority to conclude agreements with States), must, accordingly, be seen as a means of protecting not only the interests of individual Indian children and families, but also of the tribes themselves." (*Holyfield*, at p. 49, fn. omitted.)

The United States Supreme Court invalidated the adoption decree notwithstanding the fact that the three-year-old children had lived their entire lives with the adoptive parents. "We are not unaware that over three years have passed since the twin babies were born and placed in the Holyfield home, and that a court deciding their fate today is not writing on a blank slate in the same way it would have in January 1986. Three years' development of family ties cannot be undone, and a separation at this point would doubtless cause considerable pain. [¶] Whatever feelings we might have as to where the twins should live, however, it is not for us to decide that question. We have been asked to decide the legal question of *who* should make the custody determination concerning these children—not what the outcome of that determination should be. The law places that decision in the hands of the Choctaw tribal court. Had the mandate of the ICWA been followed in 1986, of course, much potential anguish might have been avoided, and in any case the law cannot be applied so as automatically to 'reward those who obtain custody, whether lawfully or otherwise, and maintain it during any ensuing (and protracted) litigation.' [Citation.] It is not ours to say whether the trauma that might result from removing these children from their adoptive family should outweigh the interest of the Tribe—and perhaps the children themselves—in having them raised as part of the Choctaw community. Rather, 'we must defer to the experience, wisdom, and compassion of the [Choctaw] tribal courts to fashion an appropriate remedy.' " (*Holyfield, supra*, 490 U.S. at pp. 53–54, fn. omitted.)

After *Holyfield*, California Courts of Appeal continued to be divided on the validity of the existing Indian family doctrine. The Third District rejected the existing Indian family doctrine in 1990. "Limiting the Act's applicability solely to situations where nonfamily entities physically remove Indian children from actual Indian dwellings deprecates the very links—parental, tribal and cultural—the Act is designed to preserve." (*In re Crystal K.* (1990) 226 Cal.App.3d 655, 666 [276 Cal.Rptr. 619] [application of the ICWA's substantive provisions in a stepparent adoption case].) The First District rejected the existing Indian family doctrine in 1991. (*Lindsay, supra*, 229 Cal.App.3d 404, 416 [application of the ICWA's notice provisions in a stepparent adoption case].)

On the other hand, the Second District accepted a version of the existing Indian family doctrine in 1996 in *In re Bridget R.* (1996) 41 Cal.App.4th 1483 [49 Cal.Rptr.2d 507] (*Bridget*). *Bridget* is the primary California case supporting the existing Indian family doctrine. *Bridget* involved the application of the ICWA's substantive provisions in a voluntary relinquishment case. (*Bridget*, at p. 1491.) The parents' voluntary relinquishment of the children at birth had not complied with the ICWA's substantive provisions, and the tribe sought to intervene. The Second District held that recognition of the existing Indian family doctrine was "necessary in a case such as this in order to preserve ICWA's constitutionality" under the United States Constitution. (*Bridget*, at p. 1492.) Acknowledging *Holyfield*, the Second District conceded that the existing Indian family doctrine could not apply simply because *the child* lacked ties to the tribe, but it held that this doctrine did apply when *both the child and the parents* lacked ties to the tribe. (*Bridget*, at pp. 1500–1501.)

The Second District identified the primary foundation for the existing Indian family doctrine as the child's federal due process right to a stable home. "The intent of Congress in enacting ICWA was to 'protect the best interests of Indian children,' as well as 'promote the stability and security of Indian tribes· and families.' (25 U.S.C. § 1902.) These two elements of ICWA's underlying policy are in harmony in the circumstance in which ICWA was primarily intended to apply—where nontribal public and private agencies act to remove Indian children from their homes and place them in non-Indian homes or institutions. (See 25 U.S.C. § 1901(4).) But in cases such as this one, where, owing to noncompliance with ICWA's procedural requirements, ICWA's remedial provisions are invoked to remove children from adoptive families to whom the children *were voluntarily given by the biological parents*; the harmony is bound to be strained. Indeed, in circumstances of this kind, the interests of the tribe and the biological family may be in direct conflict with the children's strong needs, which we find to be constitutionally protected, to remain through their developing years in one stable and loving home." (*Bridget, supra*, 41 Cal.App.4th at p. 1502.)

The Second District held that the child's federal constitutional right precluded the application of the ICWA. "Legislation which interferes with the enjoyment of a fundamental right is unreasonable under the due process clause and must be set aside or limited unless such legislation serves a compelling public purpose and is necessary to the accomplishment of that purpose. In other words, such legislation would be subject to a strict scrutiny standard of review." (*Bridget, supra*, 41 Cal.App.4th at p. 1503.) Since the tribe's interest was not constitutionally protected, and, in the Second District's view, the ICWA was not narrowly tailored under the circumstances before it, the ICWA could not be constitutionally applied. (*Bridget*, at p. 1507.) Essentially, the Second District held that the ICWA could not be constitutionally applied where the "biological parents do not have a significant social, cultural or political relationship with an Indian community." (*Bridget*, at p. 1507.)

The Second District also offered two alternative justifications for its holding that the ICWA would be unconstitutional as applied unless limited by the existing Indian family doctrine. One alternative justification was that the ICWA violated the Indian child's right to equal protection. The court asserted that the ICWA treated Indian children differently solely due to their "race." (*Bridget, supra*, 41 Cal.App.4th at p. 1508.) Since racial classifications were subject to strict scrutiny, and the court had already determined that the ICWA was not narrowly tailored, the ICWA's constitutionality could be preserved only by limiting its application to existing Indian families. (*Bridget*, at pp. 1508–1510.) The other alternative justification was that the Tenth Amendment prohibited Congress from invading this traditional province of state legislation. (*Bridget*, at pp. 1510–1511.)

In 1996, the Fourth District accepted the existing Indian family doctrine in *In re Alexandria Y.* (1996) 45 Cal.App.4th 1483 [53 Cal.Rptr.2d 679] (*Alexandria*), a case in which the child had been removed at birth. The Fourth District agreed with most of the Second District's reasoning in *Bridget*, though it expressed the belief, in dictum, that the Second District had wrongfully limited the existing Indian family doctrine to those situations where *both* the child *and* the parents lacked ties to the tribe. "[W]hether there is an existing Indian family is dependent on the unique facts of each situation." (*Alexandria*, at p. 1493.)

In 1997, in *Crystal R. v. Superior Court, supra,* 59 Cal.App.4th 703, a panel of this court accepted the existing Indian family doctrine based on a legislative intent rationale similar to that employed by the Kansas court in 1982.

In 1998, the Fifth District rejected the existing Indian family doctrine in *In re Alicia S.* (1998) 65 Cal.App.4th 79 [76 Cal.Rptr.2d 121].

## C.   California Legislature's 1999 Enactment of Assembly Bill No. 65

In September 1999, Assembly Bill No. 65 (1999–2000 Reg. Sess.) (Assembly Bill 65) was enacted as urgency legislation creating section 360.6.[8] This statute provides that "[a] determination by an Indian tribe that an unmarried person, who is under the age of 18 years, is either (1) a member of an Indian tribe or (2) eligible for membership in an Indian tribe and a biological child of a member of an Indian tribe *shall constitute a significant political affiliation with the tribe and shall require the application of the federal Indian Child Welfare Act to the proceedings.*" (Former § 360.6, subd. (c); see now § 224, subd. (c), italics added.)

The Legislature's intent in enacting Assembly Bill 65 was to "[p]rohibit[] the court from using the 'existing Indian family doctrine' in determining the best foster care or adoption placement for an Indian child and require[] application of the federal Indian Child Welfare Act (ICWA) for all Indian children, thereby requiring the court to follow the placement preferences set forth in ICWA rather than [follow] the placement preferences otherwise set forth in state law." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 65 (1999–2000 Reg. Sess.) as amended Apr. 27, 1999, p. 1.) The legislative analysis of Assembly Bill 65 extensively discussed the split in California's Courts of Appeal, and it explained that Assembly Bill 65 was intended to abrogate the holdings in those cases that recognized the existing Indian family doctrine. (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 65, *supra*, p. 1.)

## D.   California Cases Since 1999

In 2001, the Second District reaffirmed its acceptance of the existing Indian family doctrine in *In re Santos Y.* (2001) 92 Cal.App.4th 1274 [112 Cal.Rptr.2d 692] (*Santos*). It reiterated *Bridget*'s analysis and rejected the suggestion that the Legislature's enactment of section 360.6 had changed anything. "While jurisdiction over matters of family relations is traditionally reserved to the states, California has no independent state interest with respect to the family relations of members of federally recognized Indian tribes. It is Congress that has a constitutionally based and unique relationship with federally recognized Indian tribes (U.S. Const., art. I, § 8, cl. 3), not the states. [¶] To the extent that section 360.6 may be deemed to be an incorporation by reference of the ICWA, the issue [with regard to due process and equal protection] remains

---

[8] Section 360.6 was repealed as of January 1, 2007, and the substance of section 360.6 was enacted as section 224. All references to former section 360.6 should be understood to refer to current section 224. (Stats. 2006, ch. 838, §§ 29, 47.)

that of whether the ICWA embodies a compelling state interest that is closely tailored to the purpose of Congress's enactment as applied to this child." (*Santos*, at p. 1317.) "Section 360.6 [also] does not avoid a Tenth Amendment violation. The incorporation by reference of the ICWA in section 360.6 cannot convert the ICWA into an exercise of California's reserved power to legislate regarding family relations, because the legislation singles out the family relations of members of federally recognized Indian tribes, a subject over which the State of California lacks reserved power. (U.S. Const., art. I, § 8, cl. 3.)" (*Santos*, at pp. 1322–1323.)

In 2006, the Third District again rejected the existing Indian family doctrine in *Adoption of Hannah S.* (2006) 142 Cal.App.4th 988 [48 Cal.Rptr.3d 605] (*Hannah*), a stepparent adoption case. (*Hannah*, at p. 996.)

Neither the United States Supreme Court nor the California Supreme Court has yet addressed the issue of the validity of the existing Indian family doctrine.

### E.   Our Analysis

An unambiguous federal statute and an unambiguous state statute require the application of the ICWA's substantive provisions whenever the proceedings involve an Indian child. The plain language of these statutes precludes the existence of an exception where there is no existing Indian family. Still, the California Courts of Appeal remain in conflict over whether the ICWA applies in the absence of an existing Indian family. *Bridget* remains the leading California case in support of the validity of the existing Indian family doctrine.

In our view, the Second District's decision in *Bridget*, which was primarily based on due process, is unconvincing because it struggled and failed to find any basis for the child's purported *federal constitutional right* to *remain in a stable home. Bridget* relied heavily on a snippet from a California Supreme Court decision. "Children, too, have fundamental rights—including the fundamental right to be protected from neglect and to 'have a placement that is stable [and] permanent.' (*In re Marilyn H.* [(1993)] 5 Cal.4th [295,] 306 [19 Cal.Rptr.2d 544, 851 P.2d 826]; see also *Cynthia D. v. Superior Court* [(1993)] 5 Cal.4th [242,] 253 [19 Cal.Rptr.2d 698, 851 P.2d 1307]; *In re Angelia P.* (1981) 28 Cal.3d 908, 919 [171 Cal.Rptr. 637, 623 P.2d 198]; *In re Albert B.* (1989) 215 Cal.App.3d 361, 377 [263 Cal.Rptr. 694].) Children are not simply chattels belonging to the parent, but have fundamental interests of their own that may diverge from the interests of the parent." (*In re Jasmon O.* (1994) 8 Cal.4th 398, 419 [33 Cal.Rptr.2d 85, 878 P.2d 1297] (*Jasmon*).)

■ *Jasmon* provides no support for *Bridget*'s supposition. A "fundamental right" or "fundamental interest" is not necessarily a *federal constitutional right*. The California Supreme Court has *never held*, in *Jasmon* or elsewhere, that a child has a *federal constitutional right* to a stable placement. Although the California Supreme Court's opinion in *Jasmon* includes a single use of the phrase "the child's constitutional and statutory interest in stability" (*Jasmon, supra*, 8 Cal.4th at p. 421), the California Supreme Court's use of this phrase was dictum and provides no support whatsoever for the Second District's creation of a previously unrecognized *federal constitutional right* to a stable home.

Our society would undoubtedly benefit if every citizen, whether child or adult, could be guaranteed a stable home, and, in addition, adequate food, education, and health care. The judiciary, however, is not the body that has been delegated the task of ensuring that basic human needs are met. Courts lack the power to create new federal constitutional rights, even if such rights might enhance the health and happiness of the citizenry. Children clearly have important rights, and a child obviously has a strong *interest* in remaining in a stable home. This is precisely why our state's statutory scheme is designed to protect a child's interest in remaining in a stable home. However, we can find no federal constitutional basis for elevating a child's interest in remaining in a stable home above all federal and state laws. We reject *Bridget*'s due process premise for the existing Indian family doctrine.

■ Nor do we find any support for *Bridget*'s holding in the alternative federal constitutional bases that it cited for its acceptance of the existing Indian family doctrine. There is no equal protection violation in the application of the ICWA's provisions to Indian children, even where those children are not part of an existing Indian family. In *Morton v. Mancari* (1974) 417 U.S. 535 [41 L.Ed.2d 290, 94 S.Ct. 2474] (*Morton*), the United States Supreme Court upheld, against an equal protection challenge, a federal law favoring Indians in employment at the BIA. "The preference, as applied, is granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities whose lives and activities are governed by the BIA in a unique fashion." (*Morton*, at p. 554.) The court discounted the idea that this was a "racial" preference. "The preference is not directed towards a 'racial' group consisting of 'Indians'; instead, it applies only to members of 'federally recognized' tribes. This operates to exclude many individuals who are racially to be classified as 'Indians.' In this sense, the preference is political rather than racial in nature." (*Morton*, at p. 554, fn. 24.) "As long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed. Here, where the preference is reasonable and rationally designed to further Indian self-government, we cannot say that Congress' classification violates due process." (*Morton*, at p. 555.)

As in *Morton*, the ICWA does not apply to "individuals who are racially to be classified as 'Indians' " but limits its scope to those children who are members of, or eligible for membership in, a federally recognized tribe. The ICWA recognizes the political affiliation that follows from tribal membership in a federally recognized tribe, rather than a racial or ancestral Indian origin, and therefore does not discriminate on a racial basis. Because the ICWA does not classify children based on race, its provisions are not subject to strict scrutiny, and they need not be narrowly tailored. Even *Bridget* conceded that the ICWA is designed to serve a significant governmental interest, and Congress's codified statement of its intent coupled with the United States Supreme Court's citation of that intent with approval in *Holyfield* demands a finding that there is a rational basis for the ICWA's provisions.

■ We cannot credit *Bridget*'s claim that the ICWA violates the Tenth Amendment, particularly in the wake of former section 360.6 (now § 224). "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." (U.S. Const., 10th Amend.) Article I, section 8, clause 3 of the United States Constitution grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Even if Congress's power to "regulate Commerce . . . with the Indian Tribes" did not include the power to enact the ICWA, the only result would be that the power to adopt the ICWA was reserved to the states. By enacting former section 360.6, California utilized that reserved power. The Tenth Amendment presents no obstacle to the application of the ICWA through former section 360.6 and current section 224.

The theme that runs through many of the cases that accept the existing Indian family doctrine and refuse to apply the ICWA is the concern that the Indian child may be removed from a placement in which he or she has been thriving for a lengthy period of time. While we share that concern, we do not believe that the remedy these cases apply is lawful or even necessary. The application of the ICWA does not necessarily mean that a child will be removed from his or her placement. What it does mean is that the child's tribe will, at the very least, be given the opportunity to have input into the juvenile court's decision. We decline to presuppose that the tribe will lack sensitivity to the child's interests.

We do not share the juvenile court's skepticism of the tribe's motivations, nor can we countenance the court's statements blaming the tribe for the situation that it found itself facing. If responsibility for this situation is to be laid at anyone's door, it must be at the door of the Agency. The Agency placed Vincent in a foster/adoptive home within a month of his detention even though the Agency had been immediately informed by mother of her

Indian heritage. It was the Agency that sent inadequate ICWA notices, which necessitated the many delays caused by the first appeal. And it was the Agency that opposed the application of the ICWA more than a year ago after it had been indisputably established that Vincent was an Indian child.

"Had the mandate of the ICWA been followed [long ago], of course, much potential anguish might have been avoided, and in any case the law cannot be applied so as automatically to 'reward those who obtain custody, whether lawfully or otherwise, and maintain it during any ensuing (and protracted) litigation.' [Citation.] It is not ours to say whether the trauma that might result from removing [Vincent] from [his prospective] adoptive family should outweigh the interest of the Tribe—and perhaps the children themselves—in having them raised as part of the [Chippewa] community." (*Holyfield, supra,* 490 U.S. at pp. 53–54.)

■ As the application of the ICWA does not conflict with the United States Constitution and is consistent with our state's statutes, the juvenile court erred in refusing to apply the ICWA's substantive provisions. Our holding that the ICWA applies here obviates the need to address the other contentions made by mother and father. We reiterate that the application of the ICWA's substantive provisions will not necessarily result in Vincent's removal from his current placement. That decision depends on what results from the tribe's intervention or assumption of jurisdiction. We must trust that the tribe will act in Vincent's best interests, as the ICWA surely envisions it will.

### III.   Disposition

The juvenile court's order terminating parental rights is reversed. On remand, the juvenile court shall apply the substantive provisions of the ICWA.

Duffy, J., concurred.

**BAMATTRE-MANOUKIAN, J.,** Concurring.—In 1997, I authored *Crystal R. v. Superior Court* (1997) 59 Cal.App.4th 703 [69 Cal.Rptr.2d 414] (*Crystal R.*), in which this court joined several other California courts, as well as courts of other states, in applying the existing Indian family doctrine. In *Crystal R.*, the mother, who was not of Indian heritage, had been unable to overcome problems with drug addiction, and reunification services had been terminated as to her. The father had been incarcerated for most of seven-year-old Crystal's life and he barely knew her. He was one-half Haida Indian, but

had never had any significant ties with his tribe or with any Indian community. Crystal had been living with her maternal aunt and uncle, who had become her de facto parents and wished to adopt her. The aunt and uncle had provided the only constant and continuing source of stability in Crystal's life and she had become part of their family. In these circumstances, we found that applying the provisions of the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA), including its placement preferences and more stringent evidentiary requirements, would not further the act's purpose to protect and preserve the Indian family.

In our analysis in *Crystal R.* we endeavored to balance the various interests and policy considerations, including "Crystal's interest in achieving permanency in her family life, the interests of the biological parents in maintaining the family relationship and the tribe's interest in preserving Indian culture." (*Crystal R., supra,* 59 Cal.App.4th at p. 718.) We began with "the conviction that the child's best interests must be the paramount concern in custody proceedings." (*Ibid.*) As our California Supreme Court observed in *In re Jasmon O.* (1994) 8 Cal.4th 398 [33 Cal.Rptr.2d 85, 878 P.2d 1297], children "have fundamental rights—including the fundamental right to be protected from neglect and to 'have a placement that is stable [and] permanent.' [Citations.] Children are not simply chattels belonging to the parent, but have fundamental interests of their own that may diverge from the interests of the parent." (*Id.* at p. 419.) In a dependency proceeding, the interests of the parent and the child begin to diverge at the stage when the parents have been provided services but have failed to correct the problems that precipitated the agency's intervention. At that point, as occurred in *Crystal R.,* the focus must shift from reuniting the biological family to promoting the child's interest in an appropriate permanent placement. Crystal had found a home with her aunt and uncle where she had been living for most of four years and where, by all accounts, she was thriving. Her interests in becoming a permanent part of this family, we found, were strong and took precedence over the rights of the biological parents, who had failed to demonstrate their fitness as caretakers.

In regard to the tribe's interest at this juncture, we observed: "Where the state court proceeding has reached the point at which reunification has failed and the child's interests in permanent placement outweigh the interests of the parents, we believe it is appropriate for the court to examine the strength of the tribe's interests in protecting Indian cultural ties. If the evidence shows that such ties have become so attenuated as to be virtually nonexistent, it makes little sense to bring the requirements of the ICWA to bear on the proceedings. Not only does the application of the ICWA in such circumstances work against the best interests of the child, who is poised to move forward with his or her life as part of a stable family unit, it does nothing to further the purpose of preserving ' "the unique values of Indian culture." ' " (*Crystal R., supra,* 59 Cal.App.4th at p. 720.) In *Crystal R.,* the parent

seeking to invoke the protections of the ICWA had no significant relationship either with the tribe or with the child. The father had never lived in Alaska, where his tribe was located, and had indicated he had no intention of moving there. He was not an enrolled member of the tribe when Crystal was born, but had enrolled only after the dependency proceeding had commenced and he had received notice from the agency. Crystal had never been part of an Indian family.

We next examined the Legislative history of the ICWA and found that it reflected a concern by Congress that state agencies with little understanding of Indian culture and home life were acting to remove Indian children from their families and tribes. In enacting the ICWA, Congress sought to protect these families and "to preserve the cultural values underlying Indian home life. Preservation of the Indian family was thus 'an integral purpose of the ICWA from its inception.' [Citation.] Consistent with this purpose, the language of the Act repeatedly refers to the preservation of the Indian family, the breakup of the Indian family, and the removal of Indian children from their Indian parents or custodians." (*Crystal R., supra,* 59 Cal.App.4th at p. 722.) We agreed with courts that had found that the ICWA was not intended to apply where the preservation of an Indian family or environment was not at stake. (59 Cal.App.4th at p. 722.) We found that applying the existing Indian family doctrine in the circumstances of Crystal's case did not undermine the purposes of the act. Rather, "requiring an existing Indian family as a condition of applying the Act promotes the specific goals Congress sought to achieve. It ensures that a child's ties with his or her Indian parents and with the tribe are protected and preserved *where such ties exist.* [Citation.] In the absence of such ties, the doctrine ensures that the invocation of the Act's protections will not be abused and that state law will operate to protect the best interests of the child." (*Ibid.*)

In the case before us now, the trial court relied on *Crystal R.* and the balancing test set forth in our analysis in determining that the existing Indian family doctrine precluded the application of the requirements of the ICWA in Vincent's dependency proceeding. I believe this was error, for two reasons.

First, in *Crystal R.,* we endorsed a limited application of the doctrine in cases where neither the parents nor the child have significant demonstrable ties with tribal culture. In Vincent's case, as the majority opinion has summarized, the family has significant ties with Indian culture. The mother had lived on an Indian reservation both before, during and after Vincent's birth; at the time of his birth, she was living with her Indian cousins on a reservation; she was an enrolled member of a tribe; she had participated in various tribal ceremonies; Vincent had been given both an Indian birth name and an Indian "character name"; Vincent had participated in a special Indian

ceremony when he was a baby and had been taught the language by an elder of the tribe; both mother and father were living on the reservation at the time of the hearing; the tribe took an active involvement in the proceedings; and various Indian family members who lived on the reservation offered placement opportunities. These circumstances distinguish the case before us now from *Crystal R.,* where neither the parents nor the child had any demonstrable ties to Indian culture.

Second, in 1999, two years after the opinion in *Crystal R.* was filed, the Legislature enacted Welfare and Institutions Code former section 360.6. In doing so the Legislature indicated a clear intent to prohibit state courts from using the existing Indian family doctrine in all cases where placement of an Indian child is at issue. It provides that if a child qualifies as an Indian child under the ICWA, that in itself "shall constitute a significant political affiliation with the tribe and shall require the application of the federal Indian Child Welfare Act to the proceedings." (Welf. & Inst. Code, former § 360.6, subd. (c).)[1] As the majority notes, the legislative history of the bill enacting Welfare and Institutions Code section 360.6 extensively discussed cases such as *Crystal R.,* which had applied the existing Indian family doctrine, and explained that the new law was intended to abrogate the holdings in those cases. While I still believe that the reasons supporting the existing Indian family doctrine serve the best interests of the child in some cases, by encouraging and promoting a " 'placement that is stable [and] permanent' " (*In re Jasmon O., supra,* 8 Cal.4th at p. 419), I am constrained to defer to the clear legislative intent of Welfare and Institutions Code former section 360.6 to eliminate this doctrine and to have courts apply the requirements of the ICWA in all child custody cases where the child is found to be an Indian child. Where statutory language is clear, courts may not "[l]egislate" judicially. (*People v. Redford* (1961) 194 Cal.App.2d 200, 206 [14 Cal.Rptr. 866].)

For these reasons, I would conclude that this case must be returned to the trial court with directions to apply the substantive provisions of the ICWA. I therefore concur in the result reached by the majority. I observe that the law in this area is still unsettled and that the opinion we file today contributes to a split of authority among California courts. (See, e.g., *In re Santos Y.* (2001) 92 Cal.App.4th 1274 [112 Cal.Rptr.2d 692]; *Adoption of Hannah S.* (2006) 142 Cal.App.4th 988 [48 Cal.Rptr.3d 605].) I would therefore respectfully invite

---

[1] This section is now contained in Welfare and Institutions Code section 224, subdivision (c). (Stats. 2006, ch. 838, § 29.) Various provisions of the ICWA have now been codified in California statutes, and the ICWA has been expressly extended to adoption and guardianship proceedings. (See Welf. & Inst. Code, §§ 224.1–224.6; Fam. Code, § 170.) The intent of these recent enactments was to "ensure compliance with the federal Indian Child Welfare Act (ICWA)." (Governor's signing message to Sen. for Sen. Bill No. 678 (2005–2006 Reg. Sess.) Sept. 30, 2006.)

the California Supreme Court to review and resolve this issue and to provide guidance to courts and practitioners, as well as to the families themselves, in this most important area of the law.

A petition for a rehearing was denied June 11, 2007, and appellants' petition for review by the Supreme Court was denied September 12, 2007, S153808. Corrigan, J., was of the opinion that the petition should be granted.